## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## TRAILWAYS, INC., Respondent.

### No. 78–3056.

United States Court of Appeals, Fifth Circuit.

April 16, 1984.

**1016**

Young & Perl, P.C., Arnold E. Perl, Jay W. Kiesewetter, Memphis, Tenn., Jay C. Counts, Hewett, Johnson, Swanson & Barbee, John E. McFall, Dallas, Tex., for respondent.

Elliott Moore, Deputy Assoc., Gen. Counsel, N.L.R.B., Washington, D.C., Stanley R. Zirkin, Deputy Asst. Gen. Counsel, N.L.R.B., for petitioner.

Before WISDOM, REAVLEY and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

The National Labor Relations Board (the Board) petitioned this Court for an adjudication of civil contempt against Trailways (the Company) for violating an extant order of this Court[1] which prohibited the Company from, *inter alia*, "[d]ischarging or otherwise discriminating against employees because of their interest in or activity on behalf of the Union" in violation of § 8(a)(3) of the National Labor Relations Act (the Act) and from "[i]n any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act"[2] in violation of § 8(a)(1). The Company's allegedly contemptuous conduct consists of the following activities: maintaining an overly-broad rule prohibiting employee solicitation and distribution of materials, including union campaign materials, even while the employees are on their own, nonworking time; discriminatorily enforcing its no-distribution rules to prohibit only distribution of union campaign materials; unlawfully interrogating an employee about the materials she was distributing on behalf of the Union; threatening to discharge or otherwise discipline employees for distributing union campaign materials; unlawfully preventing an employee from displaying union campaign materials at the employee's work station; penalizing an employee for attending a Board hearing. After an evidentiary hearing, the Special Master appointed by this Court[3] concluded that the Company had committed "some instances of unlawful conduct" but that the violations were "technical in nature, *de minimis*, or excusable in the heat of a long and arduous campaign." Accordingly, he recommended that the Board's allegations of civil contempt be dismissed in their entirety. The Board here brings exception to a limited number of the Special Master's recommendations.[4] This Court concludes that the Company's violations constituted contumacious conduct. Accordingly, we reverse two of the Special Master's recom-

---

1. 237 NLRB 654 (1978), enf'd 608 F.2d 523 (1979). The backdrop for this case was a campaign by the International Union of Operating Engineers to organize the Company's clerical employees at its Dallas, Texas headquarters. The Board found that the Company violated §§ 8(a)(1) and (3) of the Act, by, *inter alia*, interrogating employees about their union activities, threatening discharge and loss of benefits should employees select the union as their bargaining agent, promising and granting benefits to discourage unionization, and discharging an employee for engaging in union activities. In addition to requiring that the Company cease and desist from violating §§ 8(a)(1) and (3), the Board's order, as enforced by this Court, 608 F.2d 523, required that the Company reinstate, with back pay, Paula Wells (the discharged employee) in her former job or its equivalent and post for sixty consecutive days a "Notice to Employees" promising to abide by the terms of the order. The order also set aside the results of the October 1977 representation election.

2. Section 7 of the Act guarantees employees the right to "self-organization, to form, join, or assist labor organizations. . . ."

3. The Special Master was appointed by order of the panel (Goldberg, Fay and Anderson) that had enforced the Board's order, *see ante* note 1.

4. The exceptions filed by the Board to the Special Master's report were limited—the Board did not object to the portions of the Special Master's report which were decided adversely to it on credibility grounds; it objected only to the portions of the report where the Special Master found violations which were deemed *de minimis* or harmless error. Of those portions of the report to which the Board brings exception, we reverse only the Special Master's conclusions regarding disparate enforcement of the no-solicitation/distribution rule and charging an employee with an absence for attendance at a Board hearing.

mendations to which the Board brings exception and find the Company in civil contempt.[5]

*Facts*

Approximately four months after this Court enforced the Board's order which found §§ 8(a)(1) and (3) violations, Paula Wells, the employee ordered reinstated by the judgment, contacted the Amalgamated Transit Union (the Union) about the possibility of organizing the Company. The Company's employees signed authorization cards designating the Union as their representative. On May 29, 1980, the Union filed an election petition with the Board's Regional Office; an election was scheduled for September 16, 1980. The Board's charges in the instant case stem from the Union's campaign leading up to the September election.

On September 23, 1980, the Union filed objections to the September election results[6] on the grounds of employer misconduct during the election.[7] On October 14, 1980, the Board filed the petition for adjudication in contempt now before this Court.

*Standard of Proof*

■ Where the Board seeks an adjudication of civil contempt, it bears the burden of producing clear and convincing evidence that the Company engaged in contumacious conduct. The Special Master concluded that the Board had failed to meet this burden of proof. We disagree.

■ Since this is a proceeding in civil, not criminal, contempt, the only issue is the Company's actual compliance with this Court's orders; any absence of willfulness is irrelevant. *McComb v. Jacksonville Paper Company*, 336 U.S. 187, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Florida Steel Corp. v. N.L.R.B.*, 648 F.2d 233, 236 (5th Cir.1981); *N.L.R.B. v. Crown Laundry and Dry Cleaners, Inc.*, 437 F.2d 290, 293 (5th Cir.1971). In *McComb* the Supreme Court stated:

> Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act. The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them a duty to obey specified provisions of the statute. An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently.

69 S.Ct. at 499. In reviewing the Special Master's findings of fact, this Court is, of course, bound by the clearly erroneous standard. Fed.R.Civ.P. 53(e)(2); *Florida Steel*, 648 F.2d at 236. We are not so constrained, however, in reviewing the Special Master's conclusion of law that the

---

5. In August 1979, subsequent to the August 18, 1978, decision and order of the Board, the Company changed ownership through a stock purchase. After the stock sale, the corporation was not dissolved, retained the same corporate name and continued in the same business. On or about April 1, 1980, the postsale company, pursuant to this Court's judgment, signed and posted in its Dallas offices the "Notice to Employees" which acknowledged the judgment, stated that the Company would not engage in the unlawful practices, and promised to take the affirmative action required by the order.

6. The results were as follows: 148 votes for the Union, 248 votes against, 1 void ballot, and 36 challenged ballots.

7. A hearing on the objections was held before a hearing officer of the Board in November and December, 1980. The officer's report, sustained by the Director of Region 16, recommended that the election results be overturned and that a new election be held. A request by the Company for review of that decision was denied. A chronology of subsequent events is excerpted from the Special Master's findings of fact:

> On May 22, 1981, a second election was held. The results of that election were 187 votes for the ATU, 168 votes against the ATU, and 58 challenged ballots. The ATU did not file objections contesting the employer's conduct during this election but did file challenges to the eligibility of certain voters. The Company filed objections to the election. On March 18, 1982, a Board's Hearing Officer issued his report recommending that the Company's objections to the election be overruled and that 21 of the 58 challenged ballots be opened and counted. That report is now pending before the Director of Region 16. On both April 6, 1981 and August 6, 1981 the ATU filed unfair labor practice charges against the Company under Sections 8(a)(1), (3) and (4). The first was withdrawn and the second dismissed by Region 16 as non-meritorious. An appeal was denied by the NLRB on December 29, 1981.

Board did not meet its burden of proof in establishing contemptuous conduct; this Court may independently review whether the Special Master's findings clearly and convincingly demonstrate contemptuous conduct. *Id.* at 236 n. 9 *citing Crown Laundry*, 437 F.2d at 293; *N.L.R.B. v. J.P. Stevens and Co.*, 538 F.2d 1152, 1160–61 (5th Circuit 1976).

### The Contempt Allegations

#### The No-Solicitation Rule

The Company's employee handbook contained the following unlawful statement regarding solicitation and distribution of written materials:

> All solicitation and/or distribution of written materials is strictly forbidden during working hours. Posting of any materials on company premises is strictly prohibited unless approval has been secured from the Personnel Department.

The statement was unlawful because it used the term "working hours" rather than "working time."[8] The handbook containing this statement was distributed to Company employees up until May or June 1980.

In March 1977 the Company posted a notice on the bulletin board which contained a lawful statement on the solicitation and distribution of materials. The notice read:

> Solicitation on Company premises shall be prohibited in working *and* nonworking areas during an employee's working time or the working time of the employee solicited. Distribution on Company premises of literature shall be prohibited during working and nonworking time in

working areas and in nonworking areas during an employee's working time. . . . (emphasis in original)

The Company had posted the notice in March 1977 and it remained posted at all times during the 1980 campaign.

■ The Board argues that the simultaneous existence of the handbook and bulletin board statements on solicitation created an ambiguity which had a reasonable tendency to inhibit lawful union activity. The Special Master concluded that the statement in the employee handbook was not a rule but merely part of an educational pamphlet distributed to new employees. Clear and convincing evidence supports his conclusion. After June 1980 the handbook was no longer distributed to new employees; the bulletin board rule was posted at all pertinent times and was later modified in accordance with the Board's changed views on solicitation and distribution. *See ante* note 8. In addition, the record indicates that any references made by supervisors to employees regarding the Company's solicitation/distribution policy were references to the posted bulletin board notice. No evidence was introduced by the Board demonstrating that Company employees were confused as to which statement represented Company policy, that they interpreted the two statements differently, or that they interpreted the handbook statement in a manner which would inhibit lawful union activity.[9] The Special Master correctly concluded that the Company's solicitation/distribution rule was lawful and that the Company did not violate this Court's order by

---

8. The phrase "working hours" could reasonably be interpreted by employees to include meals, breaks or other nonworking time. *Essex International, Inc.*, 211 N.L.R.B. 749 (1974). *See also Florida Steel Corp. v. N.L.R.B.*, 529 F.2d 1225, 1230–31 (5th Cir.1976) (holding invalid a rule barring solicitation "on the Company's time"). Rules using the phrase "working time" were presumed valid. *See, e.g., Essex International.* In 1981 the Board overruled *Essex* and held that prohibition of solicitation and distribution during "working time" was also invalid unless accompanied by a "clear statement that the restriction on organizational activity contained in the rule does not apply during break periods

and mealtimes, or other specified periods during the workday when employees are properly not engaged in performing their work tasks." *T.R.W., Inc.*, 257 N.L.R.B. 442, 443 (1981).

9. Although employee Wells testified that she considered that the handbook represented Company policy, she later stated that she never considered that she could not conduct her Union activities on Company premises during nonworking hours. If this testimony is not viewed as conflicting, it indicates that Wells did not interpret "working hours" to include any nonworking time.

maintaining an ambiguous policy regarding solicitation.

### Disparate Enforcement of the No-Solicitation/Distribution Rule

The Special Master concluded that the Company disparately applied and enforced the no-solicitation/distribution rule with regard to union materials as opposed to non-union items such as Avon, Tupperware, and football pools. He refused, however, to equate these violations of this Court's order with contumacious conduct. The following activities are involved in the allegation of disparate enforcement: supervisor Rice's August 14, 1980, warning and threat of discharge to employee Wells if she continued to distribute union keychains and pens; manager Thimesch's and supervisor Mody's August 14, 1980, orders to employee Myers to stop passing out union keychains, pencils and pens; supervisor Clark's and supervisor Anderson's August 14, 1980, threats to discharge Myers if she continued to pass out union materials; supervisor Mody's August 15, 1980, order to Myers to take down the union pocket protector from her in-basket and remove the ATU keychain from her keys.

When supervisor Rice warned Wells against solicitation of union materials and threatened to fire her if she continued to pass out union materials, he made no distinction between solicitation in working versus nonworking areas. The Special Master discounted supervisor Rice's unlawful threat to discharge Wells because the following day Rice apologized to her, saying he should have used the word "discipline" rather than "fire." [10]

Myers was told by supervisor Thimesch not to distribute union materials on Company premises and was told by supervisor Mody not to distribute union materi-als in the Accounts Payable Department. The warning by supervisor Thimesch was unlawful because an employee may lawfully make distributions in the nonworking areas during nonworking time. The Special Master discounted supervisor Thimesch's warning because Myers was not fired or even disciplined as a result of her activities. Both supervisors Clark and Anderson lawfully warned Myers that distribution of written materials in the work areas could result in disciplinary action, including termination. The Special Master discounted this warning because it represented a fair statement of a valid company rule on distribution and because the warning resulted in no disciplinary action. Finally, Myers was told by supervisor Mody to remove a union pocket protector from the inside of her in-box, although he did not ask her to remove a cartoon which was taped next to the union item, nor did he ask her to remove a Dallas Cowboy's football schedule on the wall behind her desk. Myers was also instructed by Mody to remove a union keychain from her desk although he allowed her to keep the keys on her desk. Prior to this occurrence Mody had never directed an employee to remove any items unrelated to work from his or her desk or the in-out box. The Company, in fact, had no policy regarding nonwork-related items on an employee's desk. The Special Master regarded the foregoing incident as a technical example of disparate enforcement of company rules but discounted the violation because it resulted from a miscommunication.[11]

In summary, the Special Master considered the Company's disparate enforcement of its no-solicitation/distribution policy to be mitigated by the legality of the warning, apology, mistake, or failure to result in disciplinary action. He also identi-

---

10. Of course, the threat of discipline itself was still unlawful since Rice did not distinguish between working and nonworking areas.

11. The pocket protector was inscribed with the words "Help Yourself—Vote." Director Lesko, who ordered the item removed from Myers' desk, had understood that Myers had posted a sign on her desk saying "Help Yourself" alongside a quantity of keychains. The Special Master concluded that "[s]uch explanation of miscommunication seems to me to take the sting out of this charge, bearing in mind that the Company's no distribution rule in work areas was a valid rule."

fied three further mitigating factors: (1) the Company permitted its employees to wear union buttons, keychains and pocket protectors throughout the campaign; (2) the Company had demonstrated that it was "trying to comply" with this Court's judgment;[12] (3) although some supervisors disparately enforced the no-solicitation/distribution rule, other supervisors did enforce the rule across-the-board.

█ The final mitigating factor is unsupported by the record evidence. The testimony, both from supervisors and employees, universally indicated that supervisors allowed nonunion-related solicitations and distributions, e.g., Avon and Tupperware, in working areas, some even during working time.[13] Only one supervisor, Thimesch, testified that he told employees not to distribute Avon during working hours.[14] This sole testimony is insufficient to support the finding that "[o]ther supervisors warned

and threatened to discipline employees" who engaged in selling and distributing nonwork-related materials in the working areas and who displayed personal items in the work areas. Accordingly, we find clearly erroneous the Special Master's finding of fact that some supervisors enforced the no-solicitation/distribution rule as regards nonunion, nonwork-related items.[15]

█ The other mitigating factors relied upon by the Special Master cannot validly be applied in a civil contempt proceeding. This Court ordered the Company not to discharge or otherwise discriminate against employees because of their activity on behalf of the Union and not to interfere in any other manner with employees in the exercise of the right to engage in union activity. If the Company has so discriminated or so interfered with employees' rights to engage in union activity, the Com-

12. The Special Master concluded:

This was a long campaign, vigorously pursued by the Union and strongly opposed by the Company. I was impressed with the efforts of the post sale company to conduct a lawful opposition to the ATU and to abide by the Court's decree. In this connection, on April 1, 1980, the Company posted the Notice to Employees admitting that the Board had found the Company had violated the National Labor Relations Act in the earlier campaign and promising to conduct itself lawfully in the future. The Company then reinstated Wells with back pay. It also retained new counsel who were consulted throughout the instant campaign on how to conduct a lawful opposition to the Union. Officers and supervisors were instructed on what to say and how to say it. Those who testified in this hearing gave convincing statements that post sale Trailways was trying to comply with this Court's judgment.

13. Supervisor Anderson's statement to Myers that if she (Anderson) saw Avon distributions she would stop them does not support a finding that some supervisors actually enforced the rule as regards all nonwork-related items. At best it provides some support for a finding that if given an opportunity, Anderson would have enforced the rule with regard to these items.

Similarly, the Special Master supported his finding that some supervisors enforced the rule across-the-board with a statement by supervisor Clark to Myers in which she (Clark) referred to any "written materials" as opposed to merely union materials. Correctly stating the Compa-

ny's no-distribution policy to a union supporter does not support a finding that supervisors actually enforced that policy with respect to all written materials.

14. Thimesch had told Myers that she could not distribute union material "on Company premises." His statement regarding Avon distributions was therefore more lenient than his statement to Myers regarding union distributions.

15. We would reach the same result, however, even without finding the Special Master's finding of fact clearly erroneous. By use of this final mitigating factor, the Special Master appears to be saying that there was disparate enforcement but not as much as there could have been. Either there was disparate enforcement or there was not. Even if some supervisors enforced the rule evenly, if others did not, the rule was disparately enforced. Cf. N.L.R.B. v. Sunnyland Packing Co., 557 F.2d 1157, 1162 (5th Cir.1977) (where wrongful discharge was at issue, it was not necessary for the Board to demonstrate that the no-solicitation rule never was applied to other types of activities to establish that its application to two employees made their discharge wrongful; a showing by the Board that the rule was applied to union solicitation and frequently not applied to other types of employee activities was adequate). Indeed, the Special Master found that "there was a disparity between the supervisors' prohibition against distribution of Union materials as compared to non-union items, such as football pools, Avon, Tupperware, etc." This finding supports our decision.

pany must be held in civil contempt. *See McComb,* 69 S.Ct. at 499. The issue here is simply whether the evidence reflects that the Company disparately applied the no-solicitation/distribution rule. The Special Master concluded that the Company had so applied the rule; clear and convincing evidence supports his conclusion. Whether the acts of disparate application of the rule were followed by an apology or whether they resulted from an innocent mistake is irrelevant. *Id.* In judging whether the Company is to be held in civil contempt, this Court cannot consider compensating acts on the part of the Company, e.g., allowing employees to wear union emblems.[16] It is this Court's 1979 order which controls. By its terms the order enjoined any practices which were violative of § 8(a)(1) and (3). If the no-solicitation rule in the instant case was discriminatorily applied or enforced, i.e., applied to union activities as opposed to nonunion activities, that discriminatory application violates § 8(a)(1) of the Act.

■ In concluding that the Company's disparate application of its no-solicitation/distribution rule did not warrant holding the Company in civil contempt, the Special Master attempted to distinguish both *Sunnyland* and *Bonnell* in that the employees in those cases were fired or discharged as a result of the disparate application of no-solicitation rules whereas in the instant case neither Wells nor Myers was even disciplined, much less discharged. Although it is true that in both *Sunnyland* and *Bonnell* employees were discharged, in neither case was the act of discharge crucial to the holding. What those cases turned on is clearly set forth by this Court's language in *Bonnell:* "[W]here no-solicitation rules are applied only as to union activity where other types of solicitation have gone unchallenged by the employer, the inference arises that the rules are not being used simply to serve the ends of plant order and production." *Bonnell,* 405 F.2d at 595. If the language "disciplinary action" or "without consequence" in *Sunnyland* leaves any room for doubt,[17]

16. The report of the Special Master is unclear as to the significance he placed upon the dictum in *Central Freight Lines, Inc. v. N.L.R.B.,* 653 F.2d 1023, 1026 (5th Cir.1981) in reaching his conclusion. Without further comment, he quoted the following language from this Court's opinion:

> The board says there were sports pools and a flower fund box, with no Company rule prohibiting them. It contrasts those activities with a rule forbidding union solicitation. There is, however, no evidence that the sports pool and flower fund activities had a potential for interference with work substantially equivalent to that of union solicitations....

First, the above language is clearly dictum. The holding in that case was merely that the solicitation rule at issue did not constitute the violation charged in the complaint. (The complaint alleged that the rule prohibited employees from soliciting for the Union on Company premises "at any time" but the record indicated that the rule was not in fact a blanket prohibition of solicitation for the Union on Company premises.) Secondly, *Central Freight* involved a rule prohibiting only union solicitation. This Court held that the rule was valid on its face because it was restricted to work areas and work time. The dictum in question related to the Board's allegation that the Company should also have had a rule prohibiting solicitation of sports pools and flower funds. This Court noted that the Board's complaint did not include a charge

of failure on the part of the Company to prohibit solicitation of such activities, i.e., nonunion activities. Without commenting further on this dictum, we note that it involves a balance between the undisputed right of employees to self-organization and the equally undisputed right of employers to maintain discipline in their establishments. *See Republic Aviation Corp. v. N.L.R.B.,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Where an employer has promulgated a no-solicitation rule which is not restricted to work areas and work time, the rule is presumed invalid absent evidence of special circumstances that such a rule is necessary to maintain production or discipline. *Id.* at 988 n. 10. Similarly, where a valid no-solicitation rule is discriminatorily applied only to union activity, the presumption arises that the rule does not serve the legitimate ends of plant order and production. *William L. Bonnell Co. v. N.L.R.B.,* 405 F.2d 593, 595 (5th Cir.1969). In such a case, the employer would have to introduce evidence of special circumstances necessary to justify such discriminatory application.

17. This Court stated in *Sunnyland:*

> There was evidence that no disciplinary action was ever taken against employee solicitation for any purpose other than for a union. Solicitations for such items as Avon products, candies, pies, shoes, jewelry, clothing, church lottery tickets and flowers were often con-

we now clarify that language to ensure that interrogations, warnings, threats of disciplinary action, or even mere statements not to solicit/distribute union materials fall within those terms. A rule is discriminatorily applied if it is brought to the attention of employees supporting the Union but not called to the attention of employees engaging in nonunion, nonwork-related activities. Actual sanctions, such as discharge, do not have to be applied in order to support a conclusion of disparate application or enforcement of a no-solicitation/distribution rule. In *N.L.R.B. v. Litho Press*, 512 F.2d 73, 76 (5th Cir.1975), this Court stated: "It is not necessary for a sanction to be imposed for violation of an extemporaneous command ... to constitute discrimination." [18] *See also N.L.R.B. v. Avondale Mills*, 242 F.2d 669, 671 (5th Cir.1957). (stating that "[a]n otherwise valid no-solicitation rule ... cannot be *invoked* or applied for a discriminatory anti-union purpose") (emphasis added), *aff'd sub nom., N.L.R.B. v. United Steelworkers*, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). *Compare Amalgamated Clothing Workers v. N.L.R.B.*, 365 F.2d 898, 911 (D.C.Cir.1966) (company's failure to honor a request that pro-union employees· have access to their fellow workers equal to that available to anti-union employees would support a finding of discriminatory application of the no-solicitation rule without any imposition of sanctions). As in *Bonnell*, the record presented to this Court is one of "an employee permitting solicitation on working time except where union activity is concerned." *Bonnell*, 405 F.2d at 595. Discriminatory application of the rule constitutes a violation of § 8(a)(1), and perforce, of the extant order of this Court. We therefore adjudge the Company in civil contempt of court as to its acts of disparate enforcement of the no-solicitation/distribution rule.

*The Charged Absence*

Because Wells was subpoenaed by the Board to testify in the Board representation hearing involving the Company, she was absent from work on July 1 and 2, 1980. In calculating Wells' total number of absences, the Company counted these two days as "one occurrence" of absence. This absence, together with her other absences, gave Wells a total of four and one-half occurrences of absence in a six-month period and resulted in a written warning notice stating that "absenteeism is a problem which could lead to severe disciplinary action." Under Company policy, an employee is subject to discharge after five occurrences of absence in a six-month period, and, after four occurrences, the employee is required to sign a written warning or counseling report. Had the absence due to Wells' attendance at the Board hearing not been counted, Wells would have received only an oral warning, a less severe form of discipline. The company supervisor admitted that when he gave Wells the warning, he was aware that she had attended the Board hearing under subpoena.

The Special Master looked into the issue of the Company's culpability and found that the supervisor's warning to Wells was based on a mistake. Lesko, the Company's Director of Human Resources, testified that NLRB hearings are not to be counted as absences when employees are subpoenaed, but that he could not find a subpoena for the July 1980 NLRB hearing in Wells' personnel file. The Special Master concluded that since other employees who were subpoenaed were not docked for appearances at NLRB hearings, and since Wells was not docked for appearances at subsequent hearings for which subpoenas were in her file, and since Wells' personnel file did not contain a subpoena for that particular appearance, the written warning on ab-

---

ducted by employees on company time and property without consequence.
557 F.2d at 1161.

**18.** The command involved was "If you girls are talking union talk, get off of my property." The

activity involved, handbilling, took place in a nonwork area on the employee's own time. Since the prohibition was expressly applied to "union talk," this Court found it to be discriminatory. 512 F.2d at 76.

sences she received was the result of a mistake which amounted to a harmless error.[19]

 Again, the Special Master incorrectly focused on the Company's lack of culpability in docking Wells for the NLRB appearance. First, the Company's intent was not all that pure. Wells' supervisor admitted that he was aware that Wells had attended the hearing under subpoena when he gave her the written warning. Secondly, the attempted justification for charging Wells with an absence (the lack of a subpoena in her file) is a poor one. The protections from retaliation accorded employees for attendance at Board hearings are the same regardless of whether they are subpoenaed. *NLRB v. Scrivener*, 405 U.S. 117, 92 S.Ct. 798, 802–03, 31 L.Ed.2d 79 (1972) [Section 8(a)(4) protects an employee who participates in the investigative stage of an unfair labor practice charge and no basis exists for denying the same protection to voluntary participants as to employees who are subpoenaed]. To reiterate, "[a]n act does not cease to be a violation of a law and of a decree merely because it may have been done innocently." *McComb*, 69 S.Ct. at 499. In penalizing Wells for her appearance at the hearing, the Company interfered with her right to engage in union activity and hence violated section 8(a)(1) of the Act and the 1979 order of this Court. We adjudge the Company in civil contempt of court as to its docking Wells for her appearance at the hearing.

*The Sanctions*

 The purpose of imposing judicial sanctions for civil contempt is to achieve full remedial relief. *Florida Steel*, 648 F.2d at 239. The sanctions imposed are to be remedial or coercive but not penal and are to be adapted to the particular circumstances of each case. *Id.*

 The Board urges this Court to impose the sanctions of notice distribution, union access, and a prospective fine.[20] The imposition of prospective fines is an extraordinary remedy to be imposed only where violations have been flagrant and lesser remedies appear to fail. *N.L.R.B. v. A.W. Thompson, Inc.*, 651 F.2d 1141, 1145 (5th Cir.1981). Such fines should not be imposed unless they are necessary to "coerce the contemnor into compliance with [the] court's order." *Florida Steel*, 648 F.2d at 240. In the instant case, the Company's acts of disparate enforcement occurred over a limited time period—two days. The unlawful threat to discharge Wells was retracted;[21] one of the warnings of disci-

---

**19.** The Special Master noted that Wells had subsequently received a promotion.

**20.** Specifically, the Board requested the following:

Immediately duplicating at its own expense and mailing copies of said signed notice and contempt adjudication to each of its present employees and to each of its former employees employed since the entry of the Court's judgment on December 27, 1979, and providing to the Director of the Sixteenth Regional Office of the Board a list of the names and addresses of all employees and former employees to whom said documents were mailed, together with proof of mailing;

Convening during working hours all of the Company's present employees, and reading to its employees the contents of the said Board notice in the presence of a Board agent;

Upon request by the Union or any other labor organization seeking to represent office clericals, mail room and/or stockroom employees at the Company, made within two years from the date of the contempt adjudication, immediately granting such labor organization and its representatives reasonable access to plant bulletin boards and all places where notices to employees are customarily posted, and to nonwork areas during nonwork time for the purposes of meeting and communicating with employees, for a period of one year from the date of the request;

In order to assure against further violations of the Court's judgment and contempt order, it is further recommended that the Court assess a prospective fine against the Company, in an amount to be fixed by the Court, for each and every future violation of the judgment and contempt order and, if the violation is a continuing violation, an additional fine for each day such violation continues. In view of the size and financial resources of the Company, we suggest a fine of $10,000 per violation and an additional fine of $1,000 per day for continuing violations.

**21.** As stated, however, the threat of discipline itself was also unlawful because supervisor Rice had not distinguished distributions in work ar-

plinary action given to Myers was lawful; none of the warnings or threats resulted in disciplinary action. In addition, it appears that Myers would not have been told to remove the union pocket protector and key-chain from her desk if it had not been for a miscommunication. Finally, although Wells was docked for the NLRB appearance, nothing further resulted from that action—in fact, she later received a promotion. Furthermore, although the Company's actions violated § 8(a)(1) and consequently the previous order of this Court, the specifics of the order did not refer to disparate enforcement of the no-solicitation/distribution rule. Significantly, the Special Master was impressed with the efforts the Company had made to comply with this Court's judgment. *See ante* note 12. In sum, the Company's degree of culpability does not warrant imposing prospective fines. Nor do we conclude that union access or notice distribution is necessary to achieve full remedial relief.

Having found that Trailways violated this Court's judgment of December 27, 1979, it is ordered and adjudged that Trailways is in civil contempt of this Court's order and it is further ordered that the Company by its officers, directors, and agents shall purge itself of contempt by:

(1) Complying in full with the Board's order of August 18, 1978, and not in any way, by action or inaction commit, engage in, induce, encourage, permit, or condone any violation of said judgment;

(2) Refraining from discriminatorily applying or enforcing company rules, including no-solicitation, no-distribution and no-posting rules, to deter unionization;

(3) Refraining from coercively interrogating employees about their campaigning on behalf of unions or other union activities;

(4) Refraining from threatening employees with discipline, discharge or any other retaliation because of their campaigneas from distributions in nonwork areas. *See*

ing on behalf of unions or other union activities;

(5) Removing from employee Wells' records any unfavorable personnel reports or other adverse notations resulting from her attendance at Board hearings and refraining from taking any action against Wells or any other employee as a result of such attendance;

(6) In any other manner interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the National Labor Relations Act;

(7) Immediately posting in conspicuous places in all of its Dallas, Texas locations, including all places where notices to employees are customarily posted, for a period of sixty (60) consecutive days, copies of this contempt adjudication, and, alongside, copies of the Notice to Employees appended hereto as an Appendix. Said Notice shall be signed on behalf of the Company by its President and said copies of the Adjudication and Notice shall be maintained in clearly legible condition throughout such posting period and the Company shall insure that they are not altered, defaced, or covered by any other material;

(8) Issuing written instructions to all its supervisors to comply with the provisions of the underlying judgment and this order, and to abide by the undertakings in the Notice attached hereto as an Appendix, and requiring each supervisor to signify in writing that he or she has received such instructions;

(9) Paying to the Board all costs and expenses, including reasonable attorney's fees, incurred by the Board in the investigation, preparation, presentation, and final disposition of this proceeding, and all costs relative to the Special Master. Said amount, unless agreed upon by the parties, shall be fixed by the Court upon submission by the Board of a certified statement of such costs and expenses.

It is so ordered.

*ante* note 10.

APPENDIX

NOTICE TO EMPLOYEES

PURSUANT TO

A JUDGMENT OF THE UNITED

STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

WE HEREBY NOTIFY all the employees of Trailways, Inc. that on the _____ day of _____, 1984, the Company was ADJUDICATED IN CIVIL CONTEMPT by the United States Court of Appeals for the Fifth Circuit because the Court found that officers and agents of the Company disobeyed a judgment of the Court of Appeals of December 27, 1979, requiring the Company to comply with the provisions of an order issued against it by the National Labor Relations Board. THIS ORDER FORBID THE COMPANY, its officers, agents, successors and assigns from:

Interrogating employees concerning their interest in or activity on behalf of the Union or any other labor organization;

Threatening discharge, plant closure, or other loss of benefits should employees select the Union as their bargaining agent;

Promising employees wage increases or other benefits should they abandon their interest in the Union;

Giving the employees the impression that it would be futile for them to continue their organizational efforts to select the Union as their bargaining representative.

Giving employees T-shirts or other benefits in order to influence their interest in or activity on behalf of the Union;

Discharging or otherwise discriminating against employees because of their interest in or activity on behalf of the Union.

In any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

We are now telling you sincerely that WE WILL NOT

Violate the Board's orders as enforced by the judgment of the Court of Appeals by coercively interrogating employees about their campaigning on behalf of unions or other union activities; threatening employees with discipline, discharge or any other retaliation because of their campaigning on behalf of unions or other union activities; in any other manner discriminatorily applying or enforcing Company rules, including no-solicitation, no-distribution, and no-posting rules to deter unionization.

In any other manner interfere with, restrain or coerce our employees in the exercise of their rights under Section 7 of the National Labor Relations Act.

WE WILL remove from employee Wells' records any unfavorable personnel reports or other adverse notations resulting from her attendance at Board hearings and refrain from taking any action against Wells or any other employee as a result of such attendance.

WE FURTHER NOTIFY our employees that we will in good faith comply in full with the judgment of the Court of December 27, 1979, and with all the provisions of the Contempt Adjudication which is posted alongside.

TRAILWAYS, INC.

Dated _____ By _____
(Title)

THIS IS AN OFFICIAL NOTICE AND
MUST NOT BE DEFACED
BY ANYONE

This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced, or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the Board's office, 819 Taylor Street, Ft. Worth, Texas 76102.

Phone: 817–334–2921.