NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERMEDICS, INC. and Surgitronics
Corporation, a wholly owned subsidiary
of Intermedics, Inc., Respondents.

No. 82–4482
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 30, 1983.

Elliott Moore, Deputy Assoc. Gen. Counsel, Eric G. Moskowitz, N.L.R.B., Washington, D.C., for petitioner.

Fisher & Phillips, James M. Walters and Benjamin B. Culp, Jr., Atlanta, Ga., for respondents.

Before RUBIN, JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order finding Intermedics, Inc. and Surgitronics Corp., a wholly owned subsidiary of Intermedics, guilty of violations of § 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), 158(a)(3). The order of the Board was a memorandum order adopting the findings, conclusions, and order of the administrative law judge. Two members of the Board dissented on one particular matter which will be discussed later. We have carefully reviewed the record and conclude that the order of the Board should be enforced in full.

■■■ With the one exception mentioned above which brought about the dissent of the two members of the Board, the entire issue before us is one of the factual review of the evidence contained in the record in this case. Our review must be based upon the inquiry into whether there is substantial evidence in the record viewed as a whole to support the findings of the Board. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951). Reviewing the record as a whole requires that we consider the evidence which is contrary to the conclusions drawn by the Board. But we must recognize that the Board is entitled to make reasonable choices in determining the evidence to be credited when there is conflict. *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962). *Walton* also held that the courts should give the same measure of deference to NLRB factfinding regardless of whether the remedy in question involves reinstatement of employees, as is the situation in this case, or only a milder cease and desist order. *Id.* at 407, 82 S.Ct. at 855.

## Facts

With these fundamentals in mind, we state the facts as we find them to be supported in the record considered as a whole. Our survey of the facts is brief, as the parties are well aware of the highly detailed consideration of the facts in the opinion of the administrative law judge upon which the decision of the Board is based.

Intermedics and Surgitronics are engaged in the manufacture and distribution of high technology medical and surgical devices, as well as other products. The principal product of Intermedics is a heart pacemaker. Surgitronics produces, among other items, a variety of support products for the pacemakers. Of particular relevance to this case are the Cyberlith and subassembly departments of Surgitronics. They produce the programmer for Intermedics' Cyberlith pacemaker and pacing system computers. The companies were also engaged in producing "Xerox boards".

On Sunday, July 20, 1980, the International Union of Operating Engineers, Local 564, held an organizational meeting of the employees of Surgitronics. The next day, Monday morning, July 21, employees of Surgitronics at the factory in Clute, Texas, began handing out union cards and talking to employees about the union in the company parking lot and in the lunchroom. This activity took place prior to the beginning of work. The evidence reveals that the company immediately became aware of these pro-union moves. There is ample evidence in the record that company supervisors observed employees that morning in particular and unusual ways. The company did not dispute this evidence directly but simply contends that supervisors are expected to watch employees closely.

A number of union cards were signed. Employee Sue Daniels, a group leader in the Cyberlith department, was told by a security guard that the director of manufacturing had instructed the guard to search women's purses for union cards. Of course, this is a hearsay statement and alone perhaps is entitled to little weight. Lending credence to this hearsay, however, is the fact that Sue Daniels acted on this information and went around to the employees who had put union cards in their purses and collected them all so that she could take them directly to the union headquarters at the lunch hour.

On the same day a regular monthly meeting of all Surgitronics employees was held. President Barton of Surgitronics stated

that the situation of the company was excellent, production was great, the employees were doing fine, and there was plenty of work. He placed substantial emphasis also upon the Xerox boards as an important part of Surgitronics production. He announced prospects for continued high production of the Xerox boards under a new contract.

Also on July 21, it is uncontroverted that one supervisor told a group of about thirty-five employees that if the company went union they would "lose their benefits". Further, there is evidence that on the same day another supervisor questioned an employee. The supervisor first admitted that he knew the employee was pro-union. He then asked her why she favored the union, and finally he encouraged her to advise him "if anything was going on." Other instances of close observation by supervisory personnel are detailed in the evidence for July 21 and 22.

On July 22, Sue Daniels, an employee with an outstanding record, was called into the office and summarily discharged. When she asked the reason she was told that the company felt that she was no longer happy in her job. When she replied that she did love her job, the president of the company said, "we do not feel like you do." Later that night Daniels phoned her supervisor to inquire about the real reason for the job discharge. She was finally told after some pressing that it was because of an episode which had occurred five weeks before. In that episode a number of employees had gotten upset because a quality control inspector had walked off her job but had not been fired by the company. Instead the company had allowed her to return to work. Daniels was one of a number of employees who turned in their resignations that day and as a protest occupied their work positions for three hours without working. The evidence reveals that later on the day of the protest, the employees were informed that the supervisor who had left her job but had been reinstated had been terminated. The employees were asked to rescined their resignations. The company represented that the matter would never be brought up again.

On the same day, July 22, Mary Siegel was discharged on the asserted ground that she had said earlier she was going to quit. When Siegel replied that the incident had occurred some six weeks before (the same incident involving Daniels) and that she had supposed it had been forgotten, the president of the company replied that she had an attitude problem.

The company undertakes to explain Siegel's discharge on the ground that as an inspector her rate of rejection of production was too high. Siegel claims the rejection had to do with changing from one level of quality control to another from time to time without advance notice to her. The administrative law judge had the right under the record to credit Siegel's testimony that the president of the company made no mention of any alleged misapplication of the correct inspection standards during the discharge interview.

Also discharged on July 22, was Karen Summers. At a quality control meeting that morning the supervisor was asked why Siegel had been terminated. She was told it was a disagreement with management. She persisted in her inquiries and was invited to come to the president's office. If her story is to be credited she was there told that Siegel's discharge was none of her business. Summers was then asked whether she liked her job and she replied "yes". The president then stated that she too could be terminated, and she was summarily terminated at that time.

Another employee, Debbie Goudy, was later terminated and her discharge was also charged as an unfair labor practice by the Board. The administrative law judge, however, found that the evidence failed to establish that her discharge had been for discriminatory reasons. We, therefore, do not report those facts further. Her discharge is not involved in the order the Board seeks to enforce.

On July 25, the employees who worked in the subassembly department and in the Cyberlith department were told in two separate meetings that they were to be laid off permanently as a result of lack of work

requiring the closing down of both the subassembly and Cyberlith production lines. A total of thirty-four employees were terminated and received their paychecks that day. There was evidence that by August 1, the subassembly department was again functioning, staffed with fifteen or more employees. There was also evidence that the Cyberlith line began operation again about the end of October, apparently all but one or two of the employees of the fifteen employees being transferees from Intermedics. There was also testimony that the company had hired five new employees with no prior work experience and two employees who had quit approximately a year before.

The overt union organizational activity at the Intermedics facility at Freeport, Texas, apparently began with union handbilling on August 13. Employees were handbilling off company property at a side entrance to the parking lot. A guard kept waving the employees' automobiles through the gate so that the employees could not pause to accept the handbills. Shortly thereafter, a Freeport police officer drove through the parking lot entrance and talked to the guard supervisor. He then approached an employee undertaking to handbill and told him that Intermedics didn't want him there and wanted him removed. He further warned the employee that if the union's handbilling caused one car to stop in the street those persons distributing the handbills would be arrested. The business manager of the union standing at another gate gave similar testimony as to the guards waving the cars on through.

About a week later the guards at the company suddenly began to gather up union handbills in the possession of employees as they entered the building. The guards began to demand that the leaflets be turned over to them because the literature was not allowed on company property. One employee was asked by his supervisor to remove a green union sticker from his tool box, and the employee complied.

The company admittedly had an illegally broad no-distribution rule, prohibiting the distribution of literature on company property. At a meeting of Intermedics employees President Chambers said that there was a company rule prohibiting union literature on company property. In spite of such a rule there was ample evidence of private activity on company property. Various products were sold on the property including Avon and Amway items. Also, football pools were prevalent. Employee Handbook, Par. XIII, entitled "Company Rules and Regulations", provided in rule 16, that "soliciting or distributing of literature on company property" is a serious offense "which may result in dismissal". But the handbook also contained the following provision in a later paragraph:

XXVI. NO SOLICITATION RULE.

It is the rule of the Company that unauthorized solicitation of employees or customers upon the premises or in the area of the plant or office by or on behalf of any club, society, labor union, religious organization, political party, or similar association is strictly prohibited. This prohibition applies both to employees on working time and to outsiders, and it covers soliciting in any form, whether for membership, for subscription, or for payment of money.

An election was held at Intermedics on November 10. The union lost. That election was set aside by the Board. We do not deal with the election further, however, because that portion of the order of the Board is not on appeal.

### Review of the Board's Order

We uphold the finding of 8(a)(1) violations by the company. The evidence establishes extraordinarily careful supervision and surveillance of the employees as soon as the union activity began. The limitations upon the handbilling activity were also in violation. The company concedes that its no-distribution rule was invalid. The administrative law judge properly could find the no-solicitation rule also invalid. Even though on its face it limited solicitation only to worktime, this rule was inconsistent with the rule stated earlier in the handbook which prohibited solicitation on company property. Invalidity of the narrower rule based upon this conflict is a proper conclu-

sion. The administrative law judge also held the rule invalid for another reason, and that is the legal question which will be discussed briefly at the end of the opinion.

Obviously the confiscating of handbills was a violation of the law. The instance of the supervisor telling a group of employees that if the company unionized the employees would lose their benefits was a violation. The episode of the supervisor questioning the employee, and encouraging her to advise him "if anything was going on", while minor, adds to the overall 8(a)(1) scenario of violations.

As to the 8(a)(3) violations involving the discharge of Daniels, Siegel, and Summers, the administrative law judge was within his prerogative in crediting the testimony of the employees as to the circumstances under which they were discharged. It is a most remarkable coincidence that two of the employees particularly active in union organization were fired without any warnings the day after the union organization became overt, and that the reasons given them were general reasons about their attitude with the company. The third employee was summarily discharged when she inquired as to the reason for the discharge of one of the two.

██ The most serious contention of the companies is that the layoffs in the Cyberlith and subassembly departments of Surgitronics were not discriminatory. We conclude, however, that the record also upholds the finding of a violation of § 8(a)(3) in the layoff of these employees. The record shows that the employees in these two departments were deeply involved in the organizational activities of the union. The layoff took place five days after all of the employees at a meeting had been told about the rosy prospects for production at the plant and that there was plenty of work for everyone. The company asserted at the time of the layoffs that they were permanent. Yet one of the two departments was back in operation again in approximately one week, but none of the laid off employees were recalled.

The company undertook to explain this sudden about-face in part on the grounds that there had been a delay in obtaining approval of a written request to the Food and Drug Administration for permission to produce a replacement pacemaker programmer for a programmer which had developed some technical problems as to battery life. The company also asserted that there was a high inventory of programmers which would satisfy the demand until the new programmer could be marketed. It was the discontinuance of the production of the old programmer which the company said justified the closing of the two assembly lines. Yet the evidence showed that many of the employees on the subassembly line were busy producing Xerox boards. Production quotas of the boards were not in any way reduced.

Also of particular importance is the fact that the record is quite clear that all of these factors which the company used to justify the laying off of these thirty-four employees were well-known long before the July 21 date. On that date President Barton of Surgitronics made his address in which he stated that things were going very well for the company and there was plenty of work for everyone. The company responds also that the layoff was brought about by decision of the president of Intermedics and the address was by the president of Surgitronics. The president of Surgitronics did not disclaim having knowledge of all the relevant facts, however, in his testimony. On the basis of this evidence and of all of the other unfair labor practices occurring at the same time, we cannot conclude that the administrative law judge and the Board lacked substantial evidence to support their holding that the layoff was discriminatorily motivated in violation of 8(a)(3) of the Act.

The remaining matter has to do with the alternative conclusion of the administrative law judge and the Board that the no-solicitation rule of Intermedics was invalid in prohibiting all solicitation by employees during worktime, even assuming that it was not invalid because of its conflict with the more general no-solicitation, no-distribution rule. Two of the members of the Board dissented from this conclusion concerning

the independent invalidity of the no-solicitation rule at Intermedics.

 The Board relied upon its decision in *TRW Bearings Div., Etc.,* 257 NLRB 442 (1981), prohibiting a flat rule that bars solicitation during "working time". In upholding this rule, the Board relied upon the ambiguity which is as inherent, according to the Board, in the phrase "working time" as in the phrase "working hours". It has been well established for many years that a rule barring solicitation during company "working hours" is unduly broad and invalid. *Campbell Soup Co. v. NLRB,* 380 F.2d 372, 373 (5th Cir.1967). *See also NLRB v. Daylin, Inc. Discount Div.,* 496 F.2d 484, 488 (6th Cir.1974), holding overly broad a prohibition against solicitation during "paid working hours". Further in *Florida Steel Corp. v. NLRB,* 529 F.2d 1225, 1230 (5th Cir.1976), we found invalid a rule prohibiting solicitation "on the company's time". The Board now takes the position that the phrase "working time" is just as ambiguous. The two dissenting members of the Board dissented on this ground.

 We have already held that the Board could properly conclude that the specific solicitation rule was invalid because it also was in juxtaposition to another rule prohibiting all solicitation on company property, a rule which clearly was invalid. It is not necessary for us then to pass upon the validity of the Board's current rule as exemplified in *TRW Bearings Div.* We can properly observe, however, that it would not be difficult for parties to develop wording in a collective agreement or in rules which would make very clear that the only kind of solicitation given a blanket prohibition is solicitation which might take place by a particular employee while that employee is actively performing job duties. It has already been established that the mere fact that an employee has "clocked in" is not sufficient to establish that solicitation can be automatically prohibited. *Florida Steel, supra,* 529 F.2d at 1231.

The Board's order in this case directs the usual cease and desist remedies and the posting of notices. Further it provides for the reinstatement with back pay of the three specifically discharged employees as well as the approximate thirty-four laid off employees. It also calls for the rescission of the unlawful no-distribution no-solicitation rules. By undertaking this brief three sentence summary of the enforcement order, we do not limit its enforcement to those matters summarized. We enforce the order of the Board in full.

ENFORCEMENT GRANTED.