United States Court of Appeals,

Fifth Circuit.

No. 90–4892.

COOPER TIRE & RUBBER COMPANY, Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.

April 8, 1992.

Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.

Before BROWN, DAVIS and BARKSDALE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order, which found that Cooper Tire & Rubber Company (Cooper) violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the Act). Specifically, the Board found that Cooper unlawfully (1) maintained and enforced an invalid no-solicitation rule; (2) discharged Mitzi Rye and suspended Rocky Pickering for their union solicitation; and (3) interrogated employees about Mitzi Rye's union activities. We modify and enforce the Board's order.

Introduction

After listening to numerous witnesses at a hearing held on November 14–17, 1988 and January 17–19, 1989, an ALJ found that Cooper violated sections 8(a)(1) and 8(a)(3) of the Act. The Board affirmed the ALJ's findings and adopted the ALJ's order after making minor modifications.[1]

Our review of the Board's decision is limited to a determination of whether the Board's

---

[1]The Board found fault with the ALJ's failure to provide a full expunction remedy in his recommended Order. Thus, the Board modified the order to require Cooper to remove from its records any reference to Rye's discharge and Pickering's suspension; notify both Rye and Pickering that this had been accomplished; and refrain from using the discharge and suspension as a basis for future personnel actions against them.

findings are supported by substantial evidence on the record as a whole. *Central Freight Lines, Inc. v. N.L.R.B.,* 653 F.2d 1023 (5th Cir. Unit A 1981). Our examination of the record convinces us that the requisite evidentiary basis for the Board's order was present with two exceptions. First, insofar as the Board's order requires abso lute rescission of Cooper's no-solicitation rule, we deny enforcement. We modify the order to allow employees during their non-work time to solicit in all break areas, specifically including the smoking area, restrooms, areas surrounding the water fountains and the pathway to the main break room.[2] Second, we hold that the record lacks substantial evidence to support the Board's finding of unlawful interrogation.

## All About Cooper

Cooper opened a plant in Tupelo, Mississippi in 1984 where it manufactures steel-belted radials. The Tupelo plant has about 685 employees and measures over 1,000,000 square feet. Unlike its other plants,[3] Cooper's Tupelo plant is a continuous operation, producing tires seven days a week, 24 hours per day. All of Cooper's plants are unionized except for its Tupelo plant.

Cooper staggers the starting and ending times of the various shifts so that the machines can continuously run.[4] During their shifts, Cooper employees at Tupelo get a scheduled 20-minute paid lunch break. Except for the tire assembly department where approximately 30 employees take their lunch breaks together, employees' lunch breaks are staggered so that not everyone in the same

---

[2]This opinion should not be construed so as to order Cooper to permit solicitation in actual working areas, i.e., in the immediate areas surrounding continuously operating machines. Further, we make clear that all employees involved in the solicitation are permitted to solicit in break areas only during their break times, whether informal or scheduled. That is, both the solicitor and the solicitee must be on break.

[3]Cooper has its corporate headquarters and a tire plant in Findlay, Ohio, a tire plant in Texarkana, Arkansas; inner tube plants in Mississippi and Mexico; and industrial products plants in Arkansas, Indiana and Ohio.

[4]Employees are assigned to four groups. Each group is required to work seven consecutive days in each shift: 7 a.m. to 3 p.m. (day shift); 3 p.m. until 11 p.m. (afternoon shift); and 11 p.m. to 7 a.m. (night shift). Employees receive two days off between the 7–day morning and 7–day afternoon rotations. After the 7–day night rotation, each employee receives three days off from work. Thus, in a four-week period, each employee works 21 days and is off from work 7 days.

department eats lunch at the same time. Employees are also permitted shorter informal smoking breaks and breaks to use the restroom and get a drink of water at the water fountains as needed.

Tire builders generally arrive at work 10 or 15 minutes before the start of their shift to prepare their machines. This causes the outgoing operators to suspend production even though they are still clocked in. Employees in this department have access to a lunch room, several locker rooms, restrooms, a smoking area and several water fountains.

Layout of the Plant

Because a description of the plant's physical boundaries is necessary to fully understand this case, we include the following detailed explanation of the plant's various areas moving from the east to west side of the plant.

The main area of the plant measures 430 feet along the north side and 520 feet deep. A large employee parking lot is on the plant's east side providing employees access to the plant. Two locker rooms are located just inside the main entrance and are 45 feet by 150 feet and 45 by 135 feet. The main production area is just west of the locker rooms.

In the large production room, the first area is the curing and finishing area, measuring 240 by 500 feet in size. Over 100 machines are used in the curing process. The next production areas are the first and second stage tire building facilities which together measure 360 by 300 feet. The Tupelo plant has 35 first stage and 13 second stage tire building machines in this area. To the south and west of the tire building area are the mixing areas, measuring about 90 by 420 feet and 135 by 540 feet.

The administrative offices, break room (about 20 by 70 feet), restrooms, the kit locker room and the smoking area are along the north wall of the plant. There is a water fountain in the smoking area and several other fountains are scattered throughout the plant.

### (1) *Validity of the Rule*

Cooper's no-solicitation policy prohibits all kinds of solicitation during work time and in work areas. Specifically, Cooper's employee handbook provides:

> No Cooper employee should be permitted to distribute any printed matter or solicit on behalf of any group or organization during *working time* or in any *working area.* (Emphasis added.)

> Solicitations or distributions of printed matter by Cooper employees will be permitted only during non-working time and in non-working areas.

With the exception of the break room and locker rooms, Cooper treats the entire plant as a working area.[5]

Because the Board found that Cooper's no-solicitation rule prohibits solicitations during non-work periods in areas which had not been shown to be working areas, it concluded that the rule was invalid in violation of section 8(a)(1) of the Act. Specifically, the Board stated:

> The Company failed to demonstrate any substantial business or economic justification for extending its rule from working areas to non-working areas physically separated from the work areas, and used by employees on their non-working time on their way to the break room, smoking areas, restrooms, water fountains or in and out of the plant.

The law is well-settled that it is within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during *working hours. N.L.R.B. v. Daylin, Inc.,* 496 F.2d 484, 487 (6th Cir.1974). It is not within the province of an employer, however, to promulgate and enforce a rule prohibiting union solicitation by an employee outside of *working hours,* although on company property.[6] Absent special circumstances, time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, even though the employee is on company property. *Republic Aviation,* 324 U.S. at 804,

---

[5]There is controversy over whether the kit locker room is considered to be a work area. The Board argues that this room often serves as a lunch room for certain employees.

[6]*Id.* This standard was first announced by the Board's ruling in *Peyton Packing Co.,* 49 N.L.R.B. 828 (1943), and was approved by the Supreme Court in *Republic Aviation v. N.L.R.B.,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

65 S.Ct. at 988.

We now recite that rule with incredible ease. Although the rule on its face does indeed seem very simple, the term "working hours" is the progeny of various phrases, which have caused much confusion and controversy over the past few decades. In *Campbell Soup Co. v. N.L.R.B.,* 380 F.2d 372 (5th Cir.1967), we held invalid for vagueness and indefiniteness a ban on solicitation during "Company working hours."[7] A prohibition against solicitation during "paid working hours" also has been held to be overly broad and violative of 8(a)(1). *Daylin,* 496 F.2d at 484. In *Florida Steel Corp. v. N.L.R.B.,* 529 F.2d 1225 (5th Cir.1976), we held that a company's prohibition of solicitation "on the company's time" was similarly overly broad. These terms failed because employees could easily interpret them to bar solicitation during the entire time the employee was clocked in, including such non-working times as rest periods and coffee breaks.

In *Daylin,* the retail store's no-solicitation rule prohibited all solicitation on its premises during "paid working hours." The Court held that the rule was overbroad and invalid, stating that although the "rule would, of course, properly and lawfully forbid such solicitation on the selling floor, ... or in

---

[7]At first glance, there appears to be no significant difference between Cooper's prohibition of solicitation during "working hours" and Campbell Soup's prohibition during "company working hours." However, the terms "paid working hours," "company working hours" and "company time" inherently suggest that solicitation is banned at all times while the employee is "clocked in." Phrases such as "working hours" and "working time" instead imply that solicitation is permitted as long as the employees, both the solicitors and solicitees, are not actively performing job duties.

In *N.L.R.B. v. Intermedics, Inc.,* 715 F.2d 1022 (5th Cir.1983), we declined to decide whether the company's flat rule barring solicitation during "working time" was invalid. *See id.* at 1027. Similarly, in *N.L.R.B. v. Trailways, Inc.,* 729 F.2d 1013, 1018 (5th Cir.1984), we questioned in dictum whether the term "working hours" was lawful, recognizing that the Board previously had found that this term could reasonably be interpreted by employees to include meals, breaks or other non-working time. *See Essex Int'l, Inc.,* 211 N.L.R.B. 749 (1974).

To resolve much of this confusion, we again observe that it "would not be difficult for parties to develop wording in a collective agreement or in rules which would make very clear that the only kind of solicitation given a blanket prohibition is solicitation" occurring while either the solicitors or solicitees are "actively performing job duties." *Intermedics,* 715 F.2d at 1027.

situations where such activity interfered with job performance, ... it would also purport to forbid employees from "soliciting' union membership on break time, in restrooms and in waiting time." *Daylin,* 496 F.2d at 487 [citations omitted]. Because the plain language of the rule showed that it could be enforced to bar solicitation en route to and from the time on the clock, on break time and in the restrooms, the Court held that the rule was barred by *Republic Aviation* and by much of the subsequent case law. *Id.* at 488.

Cooper's no-solicitation rule legally bans all solicitation during "working hours." The term "working hours" does not include break periods, whether informal or regularly scheduled. Cooper's rule also bans solicitation during non-working hours in areas Cooper treats as working areas: the smoking area, restrooms and areas surrounding water fountains. We reiterate that periods of rest and lunch periods have been held to be the employees' own time, even though the employee is on company property; and a no-solicitation rule may not be applied during such periods absent special circumstances.

Cooper first argues that its no-solicitation rule is valid on its face based on *Central Freight Lines, Inc. v. N.L.R.B.,* 653 F.2d at 1023. In *Central Freight,* the company maintained an oral no-solicitation rule. The rule was informally announced at a meeting held on the company's loading dock by a company supervisor: "I would prefer that [solicitation] be contained to your lunch breaks, your coffee breaks and before and after work. I don't want to see it any more *on this dock during company work hours.*" *Id.* at 1026 (Emphasis added).

We upheld the company's rule in *Central Freight,* and refused to enforce the Board's finding that the rule was overly broad, reasoning that the "Company's no-solicitation rule, being restricted to work areas and work time, was valid on its face." *Id.* Cooper argues that its rule restricting solicitation to non-working hours and non-working areas is similarly valid on its face.

The difference between *Central Freight* and this case lies in the fact that Central Freight's rule barred solicitation on the dock, an actual working area, during working hours. In contrast, Cooper's no-solicitation rule prohibits solicitation during break times in certain break areas, such as the smoking area and restrooms. Absent a showing of special circumstances, Cooper's rule is therefore invalid under *Republic Aviation.*

Cooper alternatively argues that even if the rule is not valid on its face under *Central Freight,* special circumstances exist in its case which justify banning solicitation at all times in these areas. Cooper submits that the evidence concerning its continuous operation and staggered shift and break times justifies its ban on solicitation in certain break areas.[8] Cooper further asserts that it should not be required to take the risk that a non-working employee will disrupt the production of employees who are continuing to work, since some employees will be working while other employees are on their breaks, or arriving or leaving work.

We do not agree. Even a rule prohibiting union solicitation in actual working areas at all times has been upheld only in certain settings.[9] Stores and restaurants have come within a well-recognized exception to the general rule because of special circumstances.[10] In *N.L.R.B. v. May Dept. Stores Co.,* 154 F.2d 533 (8th Cir.1946), the Court approved the Board's order banning solicitation at all times on the selling floor of the retail store, including during the employees' lunch

---

[8]Cooper also relies upon its study of efficiency and productivity during 1984. A management team, sent to Tupelo to examine desirable employee relations policies, concluded that in Cooper's plants permitting solicitation, the constant activities of people selling resulted in disruption and loss of productivity.

[9]The Board found Cooper's no-solicitation rule invalid because it banned solicitation during non-working hours in certain break areas. Thus, we need not decide today whether a ban on solicitation during non-working hours in actual working areas is valid.

[10]*Times Publishing Co. v. N.L.R.B.,* 605 F.2d 847 (5th Cir.1979). Hospitals, like restaurants and retail stores, by their very nature also exhibit special circumstances. In *Beth Israel Hospital v. N.L.R.B.,* 437 U.S. 483, 506, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370, 389 (1978), the Supreme Court recognized that health care facilities may prohibit organizational activity in patient care and therapy areas at all times.

hour. Both the Board and the Court reasoned that even though the soliciting employee and the employee being solicited are on their lunch hour, solicitation on the selling floor where customers are normally present could be disruptive of the employer's business.

We have discovered only one solicitation case involving a continuous production facility. In *N.L.R.B. v. Texas Aluminum Co.,* 300 F.2d 315 (5th Cir.1962), the company's no-solicitation rule prohibited all "solicitation on company property." The company attempted to defend its broad rule by arguing that special circumstances made the rule necessary in order to maintain production and discipline. *Id.* at 316. The company claimed that since it did not have any particular rest time and the employees could take their rest or coffee breaks at any time, the rule was necessary to prevent employees interfering with each other during working hours.

Like Cooper's Tupelo plant, the plant operated on three shifts of eight hours each, resulting in continuous production; employees took their 20–minute lunch breaks at different times; and employees freely enjoyed coffee or rest breaks as needed. We stated in *Texas Aluminum* that the Company had the burden to prove that there was more interference with work than would have been the case if it had not adopted the rule or had maintained a regular rest period. Due to the absence of such proof, we affirmed the Board's order, invalidating the rule. *Id.*

Likewise, Cooper was required to show that special circumstances exist which justify the prohibition on solicitation near water fountains, the smoking area, in restrooms and along the way to the main break room. As in *Texas Aluminum,* we agree with the Board that Cooper failed to sufficiently demonstrate such special circumstances.

Soliciting union membership inevitably involves speech. Speech is not only a right protected by the Act, it is also a right protected by the First Amendment. *See Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945). Since Cooper employees are most assuredly permitted to chat

about the upcoming football game or the new movie in town at the water fountains, restrooms and smoking areas, casual conversation about union meetings and other union matters can similarly take place at these locations, even though Cooper technically considers them to be working areas.

Lastly, Cooper argues in the alternative that even though its rule officially bans solicitation in areas such as the smoking area and other certain break areas, there is no evidence that any employee was ever disciplined for soliciting in those areas and that therefore its rule is valid. We are not persuaded.

In *Birmingham Ornamental Iron Co. v. N.L.R.B.,* 615 F.2d 661 (5th Cir.1980), the company's employee handbook contained a rule which prohibited "any solicitation on company premises and time without prior approval of management." Although the company conceded that the rule on its face was invalid, it contended that their rule had been communicated or applied in such a way as to convey an intent clearly to permit solicitation during break time or other periods where employees are not at work. *Id.* at 667.

We found in *Birmingham Ornamental Iron* that the only solicitation rule ever communicated to the employees was the facially invalid one. Further, we rejected the company's contention that the failure of employees to complain about the rule over the years was negative evidence sufficient to show the company's clear intent to permit solicitation. *Id.* at 667.

Cooper's argument fails for the same reasons. Cooper has put forth no evidence demonstrating that it communicated to employees a no-solicitation rule which would permit solicitation in areas such as the restrooms, smoking area and near the water fountains. Cooper has in fact admitted that it does not openly condone solicitation in these areas.

Modifying the Order

Although we agree with the Board that Cooper's no-solicitation rule is invalid for the reasons explained above, we can not fully endorse the Board's order as written.  The order mandates that Cooper rescind its no-solicitation rule.  We hold that Cooper may retain its no-solicitation rule insofar as it allows solicitation in all break areas.[11]

---

[11]Accordingly, we delete paragraphs 1(a), 1(b) and 2(a) from the Board's order, which require Cooper to:

> 1. Cease and desist from
>
>> (a) Maintaining and enforcing an unlawfully broad no-solicitation rule or disparately enforcing any such rule.
>
>> (b) Suspending, discharging, or otherwise disciplining its employees for alleged violations of that no-solicitation rule.
>
> 2. Take the following affirmative action necessary to effectuate the policies of the Act.
>
>> (a) Rescind its unlawfully broad no-solicitation rule.
>
> We amend 1(a), (b) and 2(a) to read as follows:
>
> 1. Cease and desist from
>
>> (a) Maintaining and enforcing a no-solicitation rule that bans solicitation during any break times or in any break areas, including the smoking area, restrooms, areas surrounding the water fountains and pathways to the main break room, when both the solicitor and solicitee are on break time, whether informal or scheduled, and are in a break area.
>
>> (b) Suspending, discharging, or otherwise disciplining its employees for violations of a no-solicitation rule that bans solicitation during any break times or in any break areas, including the smoking area, restrooms, areas surrounding the water fountains and pathways to the main break room, when both the solicitor and solicitee are on break time, whether informal or scheduled, and are in a break area.
>
> 2. Take the following affirmative action necessary to effectuate the policies of the Act.
>
>> (a) Modify its no-solicitation rule to allow solicitation during any break times or in any break areas, including the smoking area, restrooms, areas surrounding the water fountains and pathways to the main break room, when both the solicitor and solicitee are on break time, whether informal or scheduled, and are in a break area.  However, Cooper need not amend its no-solicitation rule to permit solicitation in actual working areas, i.e., in the immediate areas surrounding continuously operating machines.

(2) *Validity of Rye's Discharge and Pickering's Suspension*

(a) Mitzi Rye

Mitzi Rye was the first and only employee terminated in connection with Cooper's no-solicitation policy. Cooper hired Mitzi Rye on February 10, 1986, and in May of 1987, she began work as a first-stage tire builder. In October, 1987, after signing an authorization card, Rye agreed to become an in-plant organizer for the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, CIC (the Union).

After Cooper management received reports from employees in early October, 1987 that Rye was soliciting on behalf of the Union on work time,[12] Rye was asked to meet with management and was warned about violating Cooper's no-solicitation rule.

After this incident, Rye was again summoned to meet with Cooper management, based upon a written statement from one of her co-workers indicating that Rye continued to solicit on work time. Cooper suspended Rye pending the results of an intensive investigation conducted by management to discover the extent to which Rye violated the no-solicitation rule. *See* discussion on interrogation *infra.* Upon the completion of its investigation, Cooper concluded that Rye repeatedly and continuously violated its no-solicitation policy and discharged Rye.

(b) Rocky Pickering

Rocky Pickering was hired by Cooper in July of 1987 as a tugger operator in the first stage tire assembly department, which required him to move materials from one department to another with

---

[12]Shift foreman Sonny Shelton stated at the Board's hearing that Rye started building approximately 45 or 50 fewer tires per day and began spending excessive time away from her work area. Shelton testified that as a result, he twice informally warned her to correct this behavior.

a motorized tugger. In October, 1987, Pickering signed a Union authorization card and joined the Union's in-plant organizing committee. Pickering was suspended for three days for passing out Union literature on working time and in a working area.[13]

(c) The Remedy

The Board found that (1) since it deemed Cooper's no-solicitation rule invalid, Rye's discharge and Pickering's suspension based on that rule were invalid; (2) Cooper engaged in discriminatory enforcement of the rule; and (3) Cooper's reason for dismissing Rye and suspending Pickering was pretextual, i.e., that Cooper disciplined Rye and Pickering because of their union activity, not for violations of its no-solicitation rule. We hold that Cooper's disciplinary actions against Rye and Pickering were both discriminatory and pretextual in violation of sections 8(a)(1) and 8(a)(3) of the Act.

Discriminatory enforcement of no-solicitation rules may result from charging violations where none exist, or by applying the rule selectively. The Board found that although Cooper almost always

---

[13]It is undisputed that on February 20, 1988, while Pickering was working the night shift, he stopped his tugger at about 11:30 p.m. to ask another tugger operator, Jerry Riddle, to supply the tire builders with certain materials. During the course of the conversation, Pickering asked Riddle if he had seen a newspaper clipping describing a cost-of-living-wage adjustment ("COLA") recently given to employees at Cooper's unionized Texarkana plant. Pickering's supervisor, Jimmy Greene, then approached and saw the clipping. Pickering showed the article to Greene, asked him if he had seen it, and Greene replied that he had not.

Greene left and immediately reported the incident to foreman Spike Rice who in turn reported it to shift foreman Jim Fitzgerald. Fitzgerald called Pickering into his office and asked him if he had handed a newspaper clipping to Riddle on company time. After Pickering admitted that he had, Fitzgerald sent Pickering home.

Employee relations manager Chuck Taylor then spoke with Pickering and commented, "Well didn't Mark Stewart [Pickering's co-worker] talk to you? ... We sent him to talk to you about your Union activities.... Didn't he warn you that you were going to get in trouble about your Union activities?" Taylor gave Pickering a three-day suspension and placed a memo in Pickering's file, which noted that he had been issued a final warning for violation of the no-solicitation rule.

enforced its no-solicitation rule,[14] it did so inconsistently and was much more harsh in its punishment as to Rye and Pickering. The record contains substantial evidence to support the Board's finding that Cooper unevenly applied its no-solicitation rule.

In a section 8(a)(3) discharge or suspension case, once the employer has articulated a legitimate business reason for its actions, the burden is upon the general counsel to present substantial evidence that anti-union animus was the moving cause of the disciplinary measures. *TRW, Inc. v. N.L.R.B.,* 654 F.2d 307 (5th Cir. Unit A 1981). Cooper advanced as its legitimate business reason the fact that Rye and Pickering solicited in work areas. However, the record contains substantial evidence showing that Cooper pretextually used the alleged violations of its no-solicitation rule to discharge Rye and suspend Pickering.

The Board found that in March of 1988, a plant engineering secretary solicited donations for a gift for a plant engineer by typing and sending a memo to this effect on working time and in a work area. Employee relations manager Chuck Taylor told the secretary that she was violating the no-solicitation rule and warned her to stop or she could lose her job.

In October of 1987, the Board found that an employee on work time asked other employees to come to his home to meet a political candidate. When he asked Taylor, he was warned that this activity might be construed as solicitation in violation of Cooper's rule. The record supports the Board's finding that numerous other employees were similarly warned in 1987 and 1988 for selling

---

[14]The parties stipulated to the following diversions from the no-solicitation rule: Cooper officially sponsored an annual drive for the United Way; and certain supervisors and employees solicited employees on work time in work areas in 1986 and 1987 for birthdays, Christmas presents, flowers for employees in the hospital, the company newsletter and a company-sponsored fishing trip.

In spite of these solicitations and after lengthy testimony, the Board maintained, "There is no question that Chuck Taylor followed a uniform policy against any form of solicitation by any employees or supervisors.... There is no evidence that the rule was disregarded, or overlooked on any widespread or general basis."

Girl Scout cookies, soliciting money for a football pool and collecting donations for sick employees and relatives and the March of Dimes.

The Board found that in all cases, employees were informally admonished that they were violating Cooper's no-solicitation rule and that no other disciplinary action was taken. There were no formal meetings and no final warnings resulting in discharge. In comparison, the Board found that Cooper showed a much more intense concern over violations of the no-solicitation rule in cases of union solicitation than it did for other violations of the rule.

We agree with the Board. First, unlike other employees who violated Cooper's no solicitation rule, the record shows that Rye was summoned to the tire assembly department manager's office to respond to accusations.[15] Second, the record supports the finding that Rye's supervisor pressured one of Rye's co-workers, Dean Johnson, to give a written statement about Rye's alleged solicitations during working time; and even wrote the statement for Johnson, turning what might have been an innocuous exchange between Rye and Johnson into a clear violation of the no-solicitation rule.[16]

[15]On October 23, 1987, Paul Smith, manager for the tire assembly department at the time, and Chuck Taylor, employee relations manager, summoned Rye into Smith's office to explain the no-solicitation policy and to give her an opportunity to respond to allegations that she had been soliciting during working hours. Rye told Smith and Taylor that she had not violated the policy. Despite Rye's denial, Shelton testified at the hearing that he believed she had been in fact soliciting on work time.

[16]Rye shared a machine with co-worker Dean Johnson whose shift followed Rye's. Like most tire assemblers, Johnson arrived fifteen minutes early to relieve Rye and prepare his machine for his shift.

> Johnson testified before the Board that in early June of 1988, after Rye had shut off the machine and while Johnson was preparing the machine for his shift, Rye asked him if had thought about coming to a Union meeting. After Johnson replied that he had not, Rye dropped a Union authorization card in his tool box and left.

> On June 24, 1988, a departmental managers' meeting with tire builders on the night shift was held. According to Production Manager Terry Jarzen's testimony, the meeting was called to discuss the distribution of Union cards at the plant. Employees were told to notify management if they were given a Union card on company time.

> During the meeting, Johnson told co-worker Debra Blake that he had been given a card by Rye, who in turn relayed this information to Supervisor Ricky Swords. Armed

Lastly, the record supports the Board's conclusion that Rye's supervisor based Rye's suspension solely upon Johnson's statement and other alleged anonymous reports that she violated the rule.

Following Rye's suspension, Cooper conducted an intensive investigation concerning Rye's union solicitation activities, questioning over 150 employees. *See* discussion on interrogation *infra.* As the Board correctly points out, the language in the memo to the supervisors clearly shows that Rye's fate was sealed even before the investigation got underway. *See id.* The investigation yielded several written statements from employees about their conversations with Rye, which formed the basis for Rye's discharge.[17] We agree with the Board that these conversations were only of a few second's duration and there was no evidence that any conversation resulted in or had the potential for disruption.

with this information about Rye, Swords later approached Johnson and asked him if Rye gave the card to him while on "company time." He responded, "Yes, I guess. It was at my machine." Johnson testified that he then talked to Jarzen about the incident and agreed to give a written statement.

[17]Kenny Dowdy worked in the same group and shift as Rye at a tire building machine about 30 feet away. His statement reflected that Rye approached him twice about the union. First, Rye dropped a UAW authorization card in Dowdy's tool box and said, "You might need this." The other time Rye suggested that he go to a Union meeting. Dowdy's statement read that although there was no pressure to do anything, both events happened during his "work time" and in his "work area."

Randy Spencer's statement provided that in June, he was also approached by Rye during both his "work time" and in his "work area." She asked him to join the Union and explained that she thought the Union could correct the seven-day rotating shift at Cooper.

David McRay worked at a machine next to Rye and was on the same shift. His statement provided that he and Rye made a bet for $700 during "work time" and "in a work area" that the Union would not succeed at Cooper.

Terry Jones was a tire builder on another shift and gave the statement that in June, "Mitzi Rye came by my m[a]chine 67 in tire assembly and ask me would I sign a UAW card."

At the Board's hearing, however, these employees contradicted their earlier statements in varying degrees. In addition, Rye's version of these conversations substantially differed from the written statements. According to Rye, McRay walked over to her machine; offered to bet her $700 that the Union would not succeed; and after she accepted the bet, McRay walked back to his machine. Rye further testified that she would occasionally talk to Dowdy about the Union only during their common lunch break, while walking to the lunch room or outside of the plant.

With respect to Pickering, the Board found that after being summoned to foreman Fitzgerald's office, he was immediately suspended even though this was his first reported violation of Cooper's no-solicitation rule. Unlike others who had violated the rule, Pickering was never given the benefit of an informal or formal warning. It was common knowledge around Cooper that Pickering was a union activist. Based upon all the evidence, including Greene's testimony that they had been waiting to "get" him for something, the ALJ believed that Cooper "was lying in wait for Pickering to break a rule."[18]

Recognizing that the ALJ is in a unique position to evaluate the credibility and the demeanor of the witnesses, we defer to plausible inferences he drew from the evidence, even though we might reach a contrary result were we deciding the case *de novo*. We find that the Board's finding of disparate enforcement and pretext are supported by substantial evidence. It is undisputed that both Rye and Pickering were productive employees who experienced no other work-related problems. We find it difficult to believe that Cooper would have discharged or suspended an otherwise satisfactory employee who committed the offense of soliciting for a charitable bake sale. We are persuaded that the actual reason for Rye's discharge and Pickering's suspension was that they were organizing a union, and we therefore fully enforce this portion of the Board's order.

### (3) *Interrogation*

The Board summarily found that Cooper violated section 8(a)(1) by unlawfully interrogating employees. In just one sentence, the Board justified its finding by explaining that in Cooper's investigation of Rye, supervisors failed to give assurances to employees that they need not answer, and that no retaliation would be taken against them.

---

[18]Pickering testified at the Board's hearing that as he left the meeting with foreman Fitzgerald and Greene, Pickering asked Greene how long they were trying to "get" him for something, and Greene responded "three months."

Although Greene denied making this statement, the ALJ credited Pickering's testimony.

An employer with a legitimate cause may interrogate employees on union matters without incurring section 8(a)(1) liability. *N.L.R.B. v. Ambox, Inc.,* 357 F.2d 138 (5th Cir.1966). An interrogation becomes illegal when the "words themselves or the context in which they are used ... suggest an element of coercion or interference." *Id.*

In determining whether a company's interrogation of employees is unlawful, several factors, commonly known as the *Bourne* criteria, should be considered:[19] (1) the history of the company's attitude toward its employees; (2) the type of information sought; (3) the rank of the interrogator in the company hierarchy; (4) the place and manner of the interrogation; (5) the truthfulness of the employee's response; (6) whether the company had a valid purpose in obtaining information concerning the union's strength; (7) whether the company communicated this purpose to the employees; and (8) whether the company assured the employees that no reprisals would be taken.

The Board found illegal interrogation in violation of section 8(a)(1) of the Act, as interpreted under the rules first established in *Johnnie's Poultry Co.,* 146 N.L.R.B. 770, 774–75 (1964), enforcement denied on other grounds, *United States v. Motorlease Corp.,* 334 F.2d 617, 619 (8th Cir.1964).[20] Nowhere in the Board's decision or in the ALJ's findings is there any indication that the *Bourne* criteria were applied. We again admonish the Board for refusing to comply with Fifth Circuit precedent by failing to apply the *Bourne* factors.[21] Fortunately, however, the ALJ has supplied us

---

[19]These criteria were originally enumerated by the Second Circuit in *Bourne v. N.L.R.B.,* 332 F.2d 47, 48 (2d Cir.1964). They were adopted and augmented by us in *N.L.R.B. v. Camco, Inc.,* 340 F.2d 803 (5th Cir.1965) and have been consistently employed since that time. *See TRW, Inc. v. N.L.R.B.,* 654 F.2d 307 (5th Cir. Unit A 1981).

[20]*See also N.L.R.B. v. Neuhoff Bros. Packers, Inc.,* 375 F.2d 372, 377–78 (5th Cir.1967); *Standard–Coosa–Thatcher Carpet Yarn v. N.L.R.B.,* 691 F.2d 1133, 1141 (4th Cir.1982).

[21]*See Fiber Glass Systems, Inc. v. N.L.R.B.,* 807 F.2d 461 (5th Cir.1987); *Marathon Le Tourneau Co. v. N.L.R.B.,* 699 F.2d 248 (5th Cir.1983); *Dow Chem. Co. v. N.L.R.B.,* 660 F.2d 637 (5th Cir.1981); *TRW, Inc., v. N.L.R.B.,* 654 F.2d 307 (5th Cir.1981); *TRW–United Greenfield Div. v. N.L.R.B., 637 F.2d 410 (5th Cir.1981);* Paceco v. N.L.R.B., *601 F.2d 180 (5th Cir.1979);* Delco–Remy Div., General Motors Corp. v. N.L.R.B., *596 F.2d 1295 (5th Cir.1979);* Federal–Mogul Corp. v. N.L.R.B., *566 F.2d 1245 (5th Cir.1978).*

with enough facts in this case so that we may apply the criteria listed above and avoid the necessity of a remand.

Cooper's Investigation

It is undisputed that on June 27, 1988, Taylor prepared a memorandum detailing a department-wide investigation of Rye's union activities. The memo informed supervisors as follows:

> As you are probably aware, Mitzi Rye has been suspended for violating Cooper's no-solicitation policy. Apparently, she has solicited ... or distributed materials for an outside organization on work time and in work areas. Since she has previously been warned concerning this, it seems clear that she willfully and intentionally violated this policy.
>
> In order to insure that she is being treated fairly, Cooper is making a full investigation into this before any final decision is made concerning her future employment. As such I need to ask you a couple of questions. The purposes of these questions is to find out the degree to which Mitzi violated our no-solicitation policy, not to find out if you agreed or disagreed with what she may have been soliciting you about.

The memo then instructed supervisors to explain Cooper's no-solicitation policy to each employee and then ask the employee a series of questions:

> Has Mitzi ever asked you, during work time and in a work area, to sign an authorization card or attend meetings for any organization? to contribute money on behalf of any organization?
>
> Are you aware of any cases where she has handed out printed materials during work time in the work area?
>
> Are you aware of any other employees who have violated the no-solicitation/no-distribution policy?
>
> If you ever have any questions concerning whether or not an activity is in violation of this policy, simply ask me or your employee relations supervisor.

Between June 27 and June 29, 1988, four supervisors moved through the tire building department and asked more than 150 employees the prescribed questions. Supervisors Shelton, Swords, Rodney Rice and Lawrence Dangerfield testified before the Board that if a particular employee did not want to answer the questions, they did not pressure that employee to answer. Several employees agreed to give written statements.

Applying the *Bourne* factors, we conclude:

(1) The record is silent as to the history of Cooper's attitude toward its employees;

(2) Cooper sought general information about violations of its no-solicitation policy, and specifically, whether Rye ever solicited during work time and in work areas. Although supervisors failed to inform employees that their answers would not be used against them later, the record indicates that most employees voluntarily offered responses;

(3) The supervisors asking the questions were generally shift foremen and low-level supervisors;

(4) The investigation was conducted throughout the tire assembly department. Supervisors moved through the employees' work stations in order to ask the questions;

(5) Four employees offered to give written statements while others chose to have their answers to the supervisors' questions remain anonymous. Based on the permitted anonymity and the fact that others were willing to give written statements, most employees should have felt comfortable in offering truthful answers. The potential exception is Randy Spencer. In his written statement, Spencer stated that Rye approached him on the tire assembly floor about joining the union while he was working and while she should have been working. Later, at the Board's hearing, both Spencer and Rye testified that Rye approached him at the water fountains while he was "joking around" with several other employees. This contradiction, however, is not significant enough to render Cooper's investigation illegally coercive;

(6) & (7) The purpose of Cooper's interrogation was not to gain information about the union's strength; and

(8) Cooper did not assure its employees that no reprisals would be taken. However, this alone would not be enough to constitute a section 8(a)(1) violation.

When all the factors above are examined, Cooper's investigation into Rye's violations of its no-solicitation policy was legitimate and did not constitute unlawful, coercive interrogation about union activities.[22] We therefore modify the Board's order, deleting paragraphs 1(c), (d) and (e).[23]

Conclusion

For the above reasons, we enforce the Board's order as modified.

ORDER MODIFIED and ENFORCED.

---

[22]*Compare TRW, Inc. v. N.L.R.B.,* 654 F.2d at 307, where this court refused to hold that an interrogation and the company's attorney was unlawfully coercive. There the employee was called to report to a company conference room to meet with the attorney to discuss alleged improper union monetary reimbursement to employees. After the conversation, the attorney drafted a statement and asked the employee to sign it. She refused and the attorney prepared a second and later a third statement. Refusing to sign these statements, the employee explained that she was embarrassed about being called out of her department and how her participation might look to her fellow employees. The attorney purportedly said, "Embarrassing is when I'm going to subpoena you—I'm going to go and pull you out of [the] carbon department and take you to court, and then you'll have to testify, then that's embarrassment." The attorney then ordered the employee to leave. *Id.* at 314–15. We found that "the interview, although perilously close, did not reach the level of an unlawful interrogation." *Id.* at 315.

[23]Paragraphs 1(c), (d) and (e) order Cooper to "cease and desist" from:

> Creating the impression that its employees' union activities are under surveillance; threatening its employees with reprisals because of their union activities; and interrogating its employees about their own or others' union activities without first having given these employees proper safeguards against retaliation or discrimination.