**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

————————

No. 00-60013

————————

POLY-AMERICA, INC.,

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

---

Petition for Review & Cross Petition for Enforcement of an
Order of the National Labor Relations Board

---

August 9, 2001

Before BARKSDALE, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Poly-America, Inc. seeks review of an order by the National Labor Relations Board finding that it violated sections 8(a)(1) and (3) of the National Labor Relations Act in its handling of events surrounding a work stoppage at one of its plants. In general terms, the order requires Poly-America to (1) cease and desist from promulgating and enforcing various anti-union policies; (2) reinstate with backpay the nineteen employees who participated in the work stoppage; (3) reinstate with backpay a former employee associated with the union whom it discharged on misconduct grounds; and (4)

provide backpay to two employees associated with the union whom it suspended on misconduct grounds. The Board cross-petitions for enforcement.

We do not find substantial evidence to support the findings on which the Board based its order requiring Poly-America to offer reinstatement and backpay to Jason Snow, to cease and desist from threatening employees that it was rescinding an offer to pay for time off because of their union activities, to cease and desist from telling employees that they had been fired because of their union activities, and to cease and desist from conditioning the reinstatement of striking employees on acceptance within an unreasonably short period of time. We therefore reverse that portion of the Board's order. We do find substantial evidence in the record to support all of the Board's other determinations. Accordingly, we deny Poly-America's petition insofar as it asks this court to reverse the Board's decision as it applies to the promulgation of an overly broad anti-solicitation rule, threats against and interrogation of employees, videotaping of employees' union activities, and discharge and suspension of union-active employees.

## I

Poly-America operates a plastic products manufacturing plant in Grand Prairie, Texas; in November 1996, the Union of Needletrades, Industrial and Textile Employees (UNITE) attempted to unionize the plant. One impetus for the unionization was an INS raid which had generated a great deal of employee dissatisfaction. Following the raid on November 6, the company owner addressed the employees through an interpreter (translating into Spanish for the Spanish-speaking work force). The parties dispute what was promised, but some of the employees apparently understood the owner to say that they would be paid for the remainder of the shift following the meeting, regardless of whether they returned to work.

Nineteen of these employees walked off the job on November 14 when, after receiving their paychecks for that period, they learned that they had not been paid for the entire November 6 shift. The plant manager attempted to convince the employees to return to work, but the workers, speaking through a UNITE organizer, announced that they were striking, and articulated three demands: to be paid for the evening shift of November 14, to be ensured that there would be no reprisals against the strikers, and to be paid for the entire November 6 shift. The plant manager agreed to the first two conditions, but told the strikers he had no authority to promise payment for the November 6 shift.

The parties dispute what occurred following this impasse on the evening of November 14. Poly-America maintains that the employees refused to return to work, forcing the company to replace the strikers. Poly-America insists that it made replacement hires before informing its employees that they could not return to work. The NLRB, however, maintains that the employees were discharged almost immediately following the walkout, on the night of November 14. Because this discharge took place before any replacement hires were made, the NLRB argues, the discharge was unlawful.

Surrounding the November 14 walkout were a host of other less dramatic confrontations between Poly-America management and plant employees—alleged destruction of union literature, videotaping of employees engaged in union activity, threats against employees interested in the union, interrogation of active employees. Poly-America disputes both whether these incidents actually occurred, as well as whether the individuals allegedly acting on behalf of the company are the company's agents.

Finally, the parties dispute the events surrounding the discharge of one employee, Jason Snow, and the suspension of two others, Britt Samson and Brian Robinson. Snow was a probationary employee, discharged by the company at the end of his probationary period, purportedly

for poor performance. Snow was also active in the union, and was frequently questioned about his union involvement. Samson and Robinson participated in union activities as well, and were suspended following a confrontation with the company security guards in which they refused to surrender the union materials they were distributing in the company parking lot, and refused to leave the property. According to the company, they were suspended for insubordination.

After conducting a hearing, an Administrative Law Judge held that Poly-America violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act.[1] The ALJ ruled against Poly-America on each of the issues outlined above, and identified a score of specific violations of the Act. The Board affirmed the ALJ's decision in essentially all respects. The Board first affirmed the decision that Poly-America violated section 8(a)(1) by promulgating and enforcing an overly broad no-solicitation/no-distribution rule; by threatening employees with loss of wages, hours, and job security if they selected union representation; by informing employees that it was rescinding its promise to pay them for the November 6 shift because of their union support; by interrogating employees about their union activities; by threatening employees with isolation and discharge if they signed union authorization cards; by threatening employees that the union would force them to strike and picket if they signed authorization cards; by videotaping employees' union activity; by confiscating and selectively destroying union materials; by telling employees that they had been fired because they had engaged in a protected strike; and by conditioning reinstatement of former strikers on response to the offer of reinstatement within an unreasonably short period of time. The Board also

---

[1] 29 U.S.C. § 158(a) provides that "[i]t shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

upheld the ALJ's findings that the company violated sections 8(a)(1) and 8(a)(3) by discharging the nineteen striking employees; by discharging Jason Snow because of his union activity; and by suspending Britt Samson and Brian Robinson on the basis of their union involvement.

The Board's order requires Poly-America to fully reinstate the nineteen striking employees, as well as Jason Snow. The order also requires Poly-America to compensate these employees, along with Britt Samson and Brian Robinson for any loss of earnings. Finally, the order calls upon Poly-America to post a remedial notice, and cease and desist from the above-described unfair labor practices.

We affirm the Board's factual findings if supported by substantial evidence on the record, considered as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951); *Central Freight Lines, Inc. v. NLRB*, 666 F.2d 238, 239 (5th Cir. 1982). Substantial evidence is "such relevant evidence that a reasonable mind would accept to support a conclusion." *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465; *see also Valmont Indus. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) ("A reviewing court will uphold the Board's decision if it is reasonable and supported by substantial evidence on the record considered as a whole."); *NLRB v. Thermon Heat Tracing Serv., Inc.*, 143 F.3d 181, 185 (5th Cir. 1998) ("Recognizing the Board's expertise in labor law, [the court] will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case de novo."); *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1314 (5th Cir. 1988) ("[T]he ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance."). We review questions of law de novo, s*ee NLRB v. Motorola, Inc.*, 991 F.2d 278, 282 (5th Cir. 1993), but defer

to the legal conclusions of the Board if reasonably grounded in the law and not inconsistent with the Act. *See Valmont Indus.*, 244 F.3d at 464.

## II

Characterization of a strike as an economic or an unfair labor practice strike affects the discretion of the company to replace the striking employees. *See NLRB v. International Van Lines*, 409 U.S. 48, 50, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972). Unfair labor practice strikers—strikers protesting alleged labor law violations by their employer—are entitled to reinstatement immediately upon an unconditional offer to return to work, regardless of whether the company has made permanent replacement hires. *See id*. Economic strikers—strikers seeking to bring economic pressure on their employer in order to gain improved working conditions or wages—are also entitled to reinstatement, unless the company is able to show a "legitimate and substantial business justification[]" for refusing reinstatement. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967); *see also NLRB v. Proler Int'l Corp.*, 635 F.2d 351, 354 (5th Cir. Unit A 1981). One such justification is replacement by a permanent employee during the strike. *See International Van Lines*, 409 U.S. at 50, 93 S.Ct. at 76. The company may not, however, discharge any striking employees before permanent replacements have in fact been hired, and "the discharge of economic strikers prior . . . to the time their places are filled constitutes an unfair labor practice." *Id*. at 52, 93 S.Ct. at 77. The company bears the burden of proving the legitimate and substantial business justification. *See Fleetwood Trailer*, 389 U.S. at 378-79, 88 S.Ct. at 546.

Here, there is no dispute that the November 14 walkout of nineteen Poly-America employees began as an economic strike, protesting the nonpayment of the entire November 6 evening shift. The issue is whether the strike at some point converted to an unfair labor practice strike, limiting the

discretion of Poly-America to refuse reinstatement. The ALJ concluded, and the Board affirmed, that (1) the striking employees were discharged before any permanent replacements were hired; (2) discharge converted the strike from an economic to an unfair labor practice strike; and (3) although not necessary to the finding that Poly-America had illegally discharged the strikers, the striking employees made an unconditional offer to return to work on the evening of November 14. Poly-America challenges the Board's determination, arguing that the strike was an economic strike throughout, that the strikers were lawfully replaced, and timely reinstated.

The record reflects that there is substantial evidence to support the ALJ's finding that the nineteen strikers were discharged on the night of November 14, before any replacement hires were made. This discharge constituted an unfair labor practice under sections 8(a)(1) and (3) of the NLRA, and had the effect of converting the strike from an economic strike to an unfair labor practice strike. *See Proler Int'l*, 635 F.2d at 353. The record does not, however, support the Board's conclusion that the strikers made an unconditional offer to return to work on the evening of November 14; indeed, the record does not contain evidence that the strikers made any unconditional offer to return until Poly-America issued personalized letters to the strikers inviting their return to work as positions became available. Because, however, we find that reinstatement with backpay is an appropriate remedy for the illegal discharge of the strikers, we enforce the Board's order. *See Swearingen Aviation Corp. v. NLRB*, 568 F.2d 458, 462-63 (5th Cir. 1987).

The evidence in the record supports the Board's determination that the strikers were discharged on the evening of November 14. There is no dispute that the strikers were not permitted access to the plant on the evening of November 14th, that plant manager Jim Green made the decision to replace the strikers that same night, and that the security guards responded to the strikers' queries

of whether they had been terminated by informing them that they were under instructions not to allow the strikers into the plant. These three pieces of evidence support the ALJ's plausible inference that Poly-America discharged the strikers on the evening of November 14th. In *NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1223-24 (5th Cir. 1980), we stated that "[t]he test of whether an employee was discharged depends upon the reasonable inferences that the employees could draw from the language used by the employer." There, we held that the Board properly inferred that employees had been discharged even where there was no evidence that the word "fired" had been used because the employees were told to leave the property, and that if they did not leave the premises, the authorities would be called. *See id.*; *see also NLRB v. Heads & Threads Co.*, 724 F.2d 282, 288 (2d Cir. 1983) (finding substantial evidence that an employee had been discharged when the employee was instructed to leave work and in fact did so, the employee did not punch his time card, and other employees also believed he had been fired).[2]

The companion question to when the strikers were discharged is the question of when replacements were hired. Poly-America bears the burden of proving that permanent replacement hires were made during the economic strike—in the absence of such proof, the discharge of the strikers constitutes an unfair labor practice. *See Fleetwood Trailer*, 389 U.S. at 378-79, 88 S.Ct. at 546. Poly-America relies on two pieces of evidence to show that replacement hires were made immediately upon the initiation of the strike on November 14th: the testimony of Jim Green that he decided to

---

[2] Poly-America challenges the ALJ's reliance on the testimony of several of the strikers that they were told they had been fired by company security guards on the night of the 14th. Poly-America contends that this evidence is hearsay, inadmissible notwithstanding the ALJ's crediting of the strikers' testimony over the contradictory testimony of the guards themselves. Because we find the undisputed, nonhearsay evidence detailed above to be adequate to support the ALJ's determination, however, we need not reach this issue.

replace the strikers 30 minutes after meeting with them, and company paperwork indicating the transfer of employees to the reprocessing section. The ALJ was not persuaded that these pieces of evidence demonstrated that the strikers were replaced before their discharge. We agree. First, a decision to replace the strikers is not synonymous with actual replacement, and it is only the latter that has legal effect. *See Noel Foods v. NLRB*, 82 F.3d 1113, 1117-18 (D.C. Cir. 1996). Second, nothing in the record indicates that the reprocessing transfers were intended to be permanent replacements of the regular processing employees. Indeed, by Jim Green's own testimony, the employees were transferred to reprocessing only "until further notice." There is substantial evidence, in this light, to support the Board's conclusion that Poly-America did not meet its burden of proving that permanent replacement hires were made on the night of November 14th.          Poly-America also challenges the Board's adoption of the ALJ's finding that the striking employees made an unconditional offer to return to work on the night of the 14th. The ALJ found that the strikers "by their statements and actions" indicated their desire to return to work without condition. Unfair labor practice strikers (which the nineteen Poly-America strikers had become by virtue of their unlawful discharge) are entitled to reinstatement immediately upon an unconditional offer to return to work. *See International Van Lines*, 409 U.S. at 50, 93 S.Ct. at 76. The evidence in the record, however, does not support the ALJ's determination that an unconditional offer was made. There is simply no indication that when the strikers attempted to reenter the plant on the night of the 14th they had abandoned the pay claim. To the contrary, the evidence indicates that the strikers returned to the plant on the morning of the 15th to discuss the very issue of the pay claim. *See Swearingen*, 568 F.2d at 464 (offer to return to work unconditionally must be communicated to employer).

This error notwithstanding, we enforce the Board's order on this issue in its entirety because,

standing alone, the unlawful discharge of the nineteen striking employees was an unfair labor practice for which reinstatement with backpay is an appropriate remedy. *See id*. at 462-63 ("The discharge of unreplaced eco nomic strikers is an unfair labor practice regardless of whether the strike ever became an unfair labor practice strike."); *NLRB v. American Linen Supply Co.*, 945 F.2d 1428, 1433 (8th Cir. 1991) ("[R]einstatement of unlawfully discharged employees is an allowable remedy even if the employees did not request reinstatement or offer to return to work.") (internal quotation omitted); *Cargill Poultry Co.*, 292 NLRB 738, 740 (1989); *Abilities & Goodwill*, 241 NLRB 27 (1979), *enforcement denied on other grounds*, 612 F.2d 6 (1st Cir. 1979).

In sum, there is substantial evidence to support the Board's determination that Poly-America discharged the strikers before any permanent replacements were hired. This discharge was an unfair labor practice under sections 8(a)(1) and (3) of the NLRA, and the order of rei nstatement and backpay will be enforced.

### III

Poly-America challenges the sufficiency of the evidence to support the findings of section 8(a)(1) violations by various Poly-America agents, supervisors, and managers. The Board affirmed the finding of the ALJ that the company violated section 8(a)(1) by promulgating and enforcing an overly broad no-solicitation/no-distribution rule; by coercively interrogating and threatening employees with loss of benefits and job security as a consequence of union membership; by videotaping the employees' union activities; by threatening employees with nonpayment of the November 6 shift as a result of their decision to join the union and ultimately informing them that they were discharged as a result of the work stoppage; and by conditioning reinstatement of the nineteen striking employees on their responding to the offer of reinstatement within an unreasonably short

period of time without business justification.

Poly-America disputes the findings on two levels: first, whether the Board properly characterized the employees responsible for the violations as supervisors or agents of Poly-America; and second, whether the violations occurred at all. Whether an employee is a supervisor is governed by section 2(11) of the NLRA: "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). "Section 2(11) is to be read in the disjunctive, with the existence of any one of the statutory powers sufficient to confer supervisory status." *NLRB v. KDFW-TV, Inc.*, 790 F.2d 1273, 1276 (5th Cir. 1986). In addition, supervisory status may also be found on the basis of various "secondary indicia" of such authority: whether the employee is perceived by co-workers as a supervisor; whether the employee attends management meetings; whether the employee engages in more time ordering others around than engaging in production work; whether the employee wears a different uniform from non-supervisors; and whether a court's finding that an individual is not a supervisor would create an unreasonable ratio of employees to supervisors. *See Monotech of Mississippi v. NLRB*, 876 F.2d 514, 517 (5th Cir. 1989). We review the Board's conclusions of supervisory status for support by substantial evidence on the record as a whole. *See NLRB v. Adco*, 6 F.3d 1110, 1117 (5th Cir. 1993); *NLRB v. McCullough Envtl. Serv., Inc.*, 5 F.3d 923, 939 (5th Cir. 1993).

As to agency, section 2(13) of the NLRA provides that "[i]n determining whether any person

is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13). An employer's responsibility for the acts of an agent is determined in accordance with the ordinary common law rules of agency. *See Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 265-66 (D.C. Cir. 1998). One of the primary indicia of agency is the apparent authority of the employee to act on behalf of the principal. *See id., quoting* Restatement (Second) of Agency § 27 (1992) ("'Apparent authority' exists where the principal engages in conduct that 'reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.'"). Stated otherwise, "[a] party claiming apparent authority of an agent must prove (1) that the acting party subjectively believed that the agent had authority to act for the principal and (2) that the subjective belief in the agent's authority was objectively reasonable." *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 n.2 (9th Cir. 2001). Like the issue of supervisory status, the existence of an agency relationship is a factual matter, and we review the Board's agency decisions for support by substantial evidence on the record considered as a whole. *See Overnite Transp.*, 140 F.3d at 265-66.

Finally, whether the section 8(a)(1) violations occurred at all is also a question we review for substantial evidence on the record to support the Board's conclusions. *See Universal Camera*, 340 U.S. at 487-88, 71 S.Ct. at 464-65; *Central Freight Lines*, 666 F.2d at 239. Again, we displace credibility findings "only in the most unusual circumstances." *Centre Property Mgmt.*, 807 F.2d at 1268.

**A**

Under section 8(a)(1), an employer may not promulgate and enforce a rule prohibiting union

solicitation by an employee outside working hours. *See Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245, 1248-49 (5th Cir. 1992). "Absent special circumstances, time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, even though the employee is on company property." *Id.* Unless the employer proffers a legitimate business reason for the prohibition, employees must also be permitted to distribute union materials as part of their solicitation effort. *See NLRB v. Transcon Lines*, 599 F.2d 719, 721 (5th Cir. 1979) ("[A] rule that extends the prohibition to non-working areas during non-work time is presumptively invalid unless the employer shows that a ban is necessary to maintain plant discipline or production."). An obvious corollary to this rule is that an employer violates section 8(a)(1) by confiscating and destroying union material. *See id.*; *see also Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1253 (5th Cir. 1978).

The Board found that Poly-America promulgated and enforced an overly broad no-solicitation/no-distribution rule, prohibiting employees from engaging in union activities on company property during lunch, break, before and after work. The Board relied on evidence that leadmen Andy Farmer, Lee Marsh, and Trinidad Rivera, junior foreman Mike Wichter, and the company security guards intimated to employees that Poly-America prohibited union solicitation on the premises at these times. The Board also found that the company confiscated and destroyed union materials, based on incidents in the breakroom and the company parking lot. Poly-America challenges the conclusion that the leadmen, the junior foreman, and the security guards are agents, as well as whether the violations occurred at all. Because we find substantial evidence to support the finding of agency status, and the section 8(a)(1) violations, we enforce the Board's order with regard to the company's overly broad no-solicitation/no-distribution rule and the confiscation and

-13-

destruction of union material.

**1**

Andy Farmer, Lee Marsh, and Trinidad Rivera are the leadmen of the Poly-America dye crew, and are generally responsible for assigning jobs to the rest of the dye crew, overseeing the crew's work, relaying messages to management, training new employees, and holding weekly meetings. We find substantial evidence on the record to support the ALJ's determination that the leadmen have the apparent authority to act on behalf of management with regard to union matters and that, consequently, the leadmen are the agents of Poly-America. First, although the leadmen lack the authority to themselves discipline other members of the dye crew, as is described below in the case of former Poly-America employee Jason Snow, they were called upon to give employee evaluations to supervisor James Qualls. *See, e.g., Barnwell Nursing Home & Health Facility,* 230 NLRB 450, 453 (1977) (holding that a non-supervisor nurse is the employer's agent when called upon to evaluate the merits of employees in the context of their union activities). Second, the record undisputedly reflects that the company utilized the leadmen as conduits for relaying company policy and other communications. *See, e.g., Pacemaker Driver Serv.*, 269 NLRB 971, 976 (1984) (holding that even if a dispatcher were not a supervisor, his role in communicating company policies and instructions to the drivers placed him in a position of apparent authority where the drivers would reasonably believe him to speak for management). Third, the testimony establishes that the dye crew members turned to the leadmen if they had workplace concerns. *See, e.g., Allegany Aggregates, Inc.*, 311 NLRB 1165, 1168 (1993) (finding an agency relationship based in part on a labor relations representative's indication to employees that he had an open door policy and they should speak to him if they had any problems). These traits gave the members of the dye crew "every reason to

believe" that the leadmen's actions or statements with regard to the union "were made in [their] capacity as [Poly-America's agents]." *NLRB v. CER Inc.*, 762 F.2d 482, 487 (5th Cir. 1985).

An agent's violation of the Act is properly imputed to the employer. *See Thermon Heat Tracing*, 143 F.3d at 186. Here, the credited testimony establishes that leadman Farmer gave employee Luis Villa a copy of the Poly-America employee handbook with the sections on solicitation and distribution of literature highlighted. These sections prohibited solicitation or distribution of literature "during working time or on the Company property"—a broad prohibition that has consistently been found to violate section 8(a)(1). *See, e.g., NLRB v. Intermedics, Inc.*, 715 F.2d 1022, 1025 (5th Cir. 1983) (holding that a rule prohibiting distribution of literature on company property is illegally broad). Further, the credited testimony establishes that Farmer told Villa not to solicit for the union during breaktime. *See, e.g., NLRB v. Trailways, Inc.*, 729 F.2d 1013, 1018 n.8 (5th Cir. 1984) (noting that a rule prohibiting solicitation during "working hours" is illegally broad unless accompanied by a clarification that the rule does not apply during breaktime). These actions alone are sufficient to constitute a violation of section 8(a)(1) in that they indicate an overly broad company policy against union solicitation.

**2**

Mike Wichter is a junior foreman in the Poly-America reprocessing department. As with the dye crew leadmen, we find substantial evidence to support the conclusion that Wichter has the apparent authority to speak on behalf of management on union matters, and that he is therefore the company's agent. First, Wichter wears the white shirt of Poly-America supervisors, makes daily work assignments, and oversees production requirements in the reprocessing department. These traits, even if alone not enough to elevate Wichter to supervisory status, are indicia that Wichter often bore

the responsibility of communicating company policy. *Compare Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 343-44 (5th Cir. 1980) (finding substantial evidence to affirm the conclusion that a company foreman was a supervisor), *with NLRB v. Dickerson-Chapman*, 964 F.2d 493, 498 (5th Cir. 1992) (finding substantial evidence to affirm the conclusion that a working foreman is not a supervisor), *and NLRB v. McEver Eng'g, Inc.*, 784 F.2d 634, 642-43 (5th Cir. 1986) (same). Second, and most uniquely, Wichter is the conduit for communication between the Spanish-speaking work force and the English-speaking management. The testimony establishes that Wichter's supervisory traits, coupled with the company's dependence on his language skills, blurred the line between when Wichter spoke on his own behalf and when he was communicating company policy. We therefore uphold the Board's finding of agency status.

We also find ample evidence that Wichter promulgated an overly broad no-solicitation/no-distribution rule. Wichter spoke to the reprocessing employees a few days before the November 14 events, and informed them that the company supervisors did not want to see any union flyers. Such a statement evidences an overly broad no-distribution rule, as it implies that even during non-working hours, employees are prohibited from engaging in union activity. *See Trailways*, 729 F.2d at 1018 n.8.

The ALJ also found that Wichter destroyed union materials. This finding was premised on the credited testimony of employee Jose Luis Aguilar that during the reprocessing meeting, Wichter tore up union flyers and threw them in the trash. Poly-America urges us not to adhere to this credibility determination, as the ALJ offered no explanation of why Wichter's testimony to the contrary was not credible. *See NLRB v. Moore Business Forms, Inc.*, 574 F.2d 835, 843 (5th Cir. 1978) ("credibility choice based on an inadequate reason, or no reason at all" does not bind the

reviewing court). Poly-America offers no compelling reason, however, to override the credibility choices of the ALJ—the company simply urges the credibility determination that favors its side of the litigation. In the absence of any showing that Aguilar's testimony was incredible, or that Wichter was for some reason better able to perceive or recall the events of the day, we refuse to disturb the credibility determinations of the ALJ and uphold the finding that Wichter unlawfully discarded union materials. *Cf. McCullough Envtl.*, 5 F.3d at 934 (disregarding the ALJ's credibility determination where no reason was given for the choice because the decision ignored portions of the record containing contradictory evidence).

**3**

Jorge Gonzalez, James Hicks, and Deborah Bowser are company security guards, and are undisputedly authorized to exclude people from the property. According to the testimony of their supervisor, Charles Kramer, the company authorized the guards to direct employees to leave if they were "on the property inappropriately." Regardless of whether the guards were specifically authorized to engage in any section 8(a)(1)-prohibited activity, it is clear that the ALJ and Board correctly characterized the guards as Poly-America's agents. *See* 29 U.S.C. § 152(13); *see also NLRB v. Aclang, Inc.*, 466 F.2d 558, 563-64 (5th Cir. 1972).

There is also substantial evidence on the record to support the finding that the security guards violated section 8(a)(1) of the Act. First, as will be discussed below, the credited testimony establishes that employees Britt Samson and Brian Robinson were asked to leave the company parking lot when they arrived an hour prior to the start of their shift to solicit for the union, and that the guards attempted to confiscate their union literature. *See Intermedics*, 715 F.2d at 1025 (rule prohibiting distribution of union literature on company property is overly broad). Second, there is

credited testimony that one security guard removed a union flyer from an employee's car. Poly-America disputes whether this incident ever occurred, given that the witness to the incident viewed the removal in pre-dawn light while located in his own car, behind the car of the unidentified employee. As the ALJ was persuaded that the witness could nevertheless make out the removal of a union flyer, however, we uphold this finding. *See Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465 ("[A] court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."). Accordingly, we find no basis to disturb the Board's findings either as to the agency of the security guards, or as to their role in effectuating an overly board no-solicitation/no-distribution rule.

**4**

Lastly, Jesse Terrazas and Charles Allgood are undisputedly Poly-America supervisors. The Board found section 8(a)(1) violations by their practice of going through the employee breakroom and selectively discarding union materials. The basis for this finding was the credited testimony of Jose Guerrero that Terrazas discarded fliers at a meeting and admonished employees that he did not want any trouble with the flyers, and the credited testimony of Brian Robinson that he observed Allgood throwing away union materials from the breakroom. Poly-America encourages us to disregard the credibility determination as Guerrero's recollection is unconfirmed by the testimony of other employees present at the meeting, and the company's published work schedule indicates that Guerrero was not scheduled to work at the time of the meeting. We disturb the ALJ's choices only where "(1) the choice is unreasonable; (2) the choice contradicts other findings of fact; (3) the choice is based on inadequate reasons or no reasons; or (4) the ALJ failed to justify the choice." *Valmont Indus.*, 244 F.3d at 464-65. Here, Guerrero testified that he could not remember which shift he

-18-

worked, but was steadfast in his assertion that he did attend the meeting. Guerrero's account of the incident is not *contradicted* by the testimony of the other employees in attendance; their testimony simply does not make mention of Terrazas' admonishment. Accordingly, we do not find the ALJ's credibility determination to be unreasonable, and we uphold the Board's finding of a section 8(a)(1) violation.

**B**

Section 8(a)(1) prohibits employers from expressing anti-union views where the expression is accompanied by a threat of reprisal or force. *See TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 418 (5th Cir. 1981), *quoting Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 105 (5th Cir.1963) ("Section 8(a)(1) is violated if, under the totality of the circumstances, 'the employees could reasonably conclude that the employer is threatening economic reprisals if they support the union.'"). This prohibition includes threats of plant closure, job loss, and loss of promotion as a consequence of union participation. *See id.*

Section 8(a)(1) also prohibits an employer from questioning employees about their union involvement if "under the totality of the circumstances, the interrogation tends to coerce employees in the exercise of their Section 7 rights." *NLRB v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 460 (5th Cir. 1983). We evaluate the coercive nature of an interrogation by noting the presence of several factors: "(1) the history of the employer's attitude toward its employees; (2) the nature of the information sought; (3) the rank of the questioner in the employer's hierarchy; (4) the place and manner of the conversation; (5) the truthfulness of the employee's reply; (6) whether the employer had a valid purpose for obtaining the information sought about the union; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer assured

-19-

the employee that no reprisals should be forthcoming should he or she support the union." *McCullough Envtl.*, 5 F.3d at 930, *citing Brookwood Furniture*, 701 F.2d at 460-61.

An employer may, however, "express general views about unions or specific views about a particular union to employees [as long as] he makes no threats of reprisal for union activity." *McCullough Envtl.,* 5 F.3d at 930, *citing NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). Similarly, an employer may question employees regarding their union involvement as long as no coercion is present.

Here, the Board found that Poly-America unlawfully threatened employees with plant closure, loss of wages and benefits, isolation, and loss of job security if they became active in the union. The Board also found that the company coercively interrogated employees in the course of attempting to identify the level of union involvement at the plant and which of its employees were union supporters. The Board based these findings on statements by purchasing manager Anthony Bertrand, junior foreman Mike Wichter, supervisor Jesse Terrazas, and the dye crew leadmen. We find substantial evidence on the record to support these findings.

**1**

The Board affirmed the finding of the ALJ that company owner Steven Ross threatened a union-active employee with plant closure as a consequence of the union activity. The basis of this finding was the credited testimony of the employee that Ross stated that he felt "like he was a cat chasing a mouse and then realized the mouse turned and started chasing him," and that he "maybe needed six months vacation and would come back and reopen this company." This conversation allegedly took place in the office of company purchasing manager Anthony Bertrand, though Bertrand testified that Ross had not directed the cat and mouse comment at the employee, and that Ross was

genuinely interested in a vacation as the company was enduring anti-trust charges as well as the union incident. On the basis of Bertrand's testimony, there was no insinuation that the plant would be closed, nor were any threats directed at the employee. The ALJ, however, credited the testimony of the employee who heard the conversation, and the ALJ's finding that the comments were threatening is a plausible inference from that credibility determination. *See Blue Cement Circle Co., Inc. v. NLRB*, 41 F.3d 203, 206 (5th Cir. 1994). Accordingly, we uphold the Board's conclusion that the company unlawfully threatened plant closure as a consequence of the union activity.[3]

**2**

The Board also found that junior foreman Mike Wichter threatened employees with loss of benefits and job security as a consequence of their union involvement. As established above, the ALJ and Board properly concluded that Wichter was Poly-America's agent at all material times during the November union activity at the plant. The alleged violations arose out of the same November

---

[3] Poly-America also challenges this finding on the grounds that the NLRB originally charged Bertrand with making the threat rather than Ross, and that, consequently, Ross was not able to testify to his defense. The NLRB now recognizes that Ross should have been the individual charged with the violation, but argues that the Board's finding should be upheld because the issue was fairly litigated on the basis of Bertrand's and the employee's testimony. We agree. It should have been immediately clear to Poly-America that on the basis of Bertrand's testimony—Poly-America's own witness—the individual charged with making the plant closure threat was Ross and not Bertrand. This error was certainly discoverable before the day of Bertrand's testimony. Further, Bertrand's testimony was not a simple denial that it was he who made the charged threat; rather, Bertrand specifically addressed the possible insinuations from Ross' cat and mouse vacation comments. *See Montgomery Ward & Co. v. NLRB*, 97 F.3d 1448 (4th Cir. 1996) (unpublished) (rejecting a company's due process argument that it did not receive notice that certain statements were at issue because the complaint provided notice of the acts alleged to be unfair labor practices and the statements "did not call for a different defense than the one mounted by the company"); *McKenzie Eng'g Co. v. NLRB*, 182 F.3d 622, 626-27 (8th Cir. 1999) ("[a] respondent to an agency action ... has been accorded due process if the record shows that it understood the issues and was afforded a full opportunity to meet the charges.") (internal quotation omitted). Under these circumstances, we hold that the issue was fairly litigated and properly considered by the ALJ.

meeting in which we have already found substantial evidence to support the finding that Wichter unlawfully tore up union materials. The parties now dispute not what was said at the meeting, but whether Wichter was lawfully expressing his own views on the disadvantages of union membership, or whether there was a coercive element to the speech. We agree with the Board that Wichter's statements that a union presence at the plant might result in reduction of wages, hours, overtime, and job security "crossed the line from merely predicting economic consequences of unionization to threats of reprisal, because there was no lawful explanation based on objective facts as to why such a loss of benefits would occur." *Poly-America, Inc.*, 328 NLRB No. 88 (1999), *citing Eldorado Tool*, 325 NLRB 222, 223 n. 6 (1997); *see also NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 966 (4th Cir. 1985) (finding substantial evidence of coercive interrogation based in part on the lack of evidence that the interrogator explained the purpose of such questioning or gave the employee any assurances against retaliation).

**3**

The Board found a violation of the Act based on threats issued by supervisor Jesse Terrazas at a November 16 employee meeting. The credited testimony establishes that Terrazas stated that the nineteen striking employees "weren't going to get their jobs back, and that if we signed with the union, the same thing was going to happen to us; we were going to be replaced." Poly-America challenges the ALJ's credibility determination, pointing to the fact that the testimony of the witness, Jose Guerrero, is uncorroborated by other employees present at the meeting. As explained above, however, there is no testimony other than Terrazas' own to contradict the testimony of Guerrero. *See Valmont Indus.*, 244 F.3d at 464-65. Accordingly, given our limited scope of review, we decline to disturb the credibility determination of the ALJ, and uphold the findings of unlawful threats of

isolation and discharge on the basis of these threats.

**4**

The Board finally found that the dye crew leadmen unlawfully interrogated members of the dye crew regarding their union involvement. Poly-America disputes the existence of a coercive element. The credited testimony establishes that leadman Farmer questioned employees about who "it was from their crew that was handing out union cards," and asked the employees whether they knew what could happen to them for passing out the cards. Dye crew member Jason Snow's testimony, discussed in detail below, also establishes that the dye crew leadmen were quite interested in who among the crew had signed up, and asked Snow whether he thought the union presence was "a good thing or a bad thing." We have previously held that where an employer is opposed to the union, and engages in repeated efforts to determine which employees have joined the union, such an atmosphere may heighten the coercive effect on an individual interrogation. *See TRW-United Greenfield Div.*, 637 F.2d at 418. The other above-described section 8(a)(1) violations and the credited testimony establishing multiple interrogations of the same individuals support the existence of such an atmosphere at Poly-America. Further, the company never articulated a valid purpose for seeking the information, never told the employees why the information was sought, and never assured them there would be no reprisals. *See id.; see also Brookwood Furniture*, 701 F.2d at 461. In this context, we uphold the Board's finding that the interrogations of various Poly-America employees by the dye crew leadmen were coercive and in violation of section 8(a)(1).[4]

---

[4] Poly-America disputes the ALJ's finding that foreman Deaun Carpenter also coercively interrogated an employee. We agree with the Board, however, that this finding was cumulative and did not affect the remedy; accordingly, we do not address the sufficiency of the evidence to support the finding.

**C**

The NLRA prohibits employers from videotaping employees' union activity in the absence of a business justification for the surveillance. *See California Acrylic Indus. v. NLRB*, 150 F.3d 1095, 1099-1100 (9th Cir. 1998). The Board upheld the ALJ's finding that the Poly-America security guards violated section 8(a)(1) by videotaping the front entrance to the plant during the November union activity. While there is no direct evidence that the company specifically authorized or instructed the security guards to videotape union activities, agency status is properly found even in the absence of such specific instructions. *See* 29 U.S.C. § 152(13); *see also Aclang, Inc.*, 466 F.2d at 563-64.

Poly-America challenges the Board's finding of a violation, arguing that the company had a proper business justification for the surveillance: monitoring the flow of traffic. The company concedes, however, that the videotape includes a recording of the encounter between union-active employees Britt Samson and Brian Robinson, described in detail below. Poly-America's traffic monitoring justification does not extend to the filming of this encounter. We therefore agree that the company unlawfully videotaped employees engaged in union activity in violation of section 8(a)(1).

**D**

The Board also found that the company violated section 8(a)(1) by informing employees that it denied pay for the November 6 shift because of the employees' union involvement. It is an unfair labor practice for an employer to forgo a benefit because of the employee's union involvement. *See Adco Elec.*, 6 F.3d at 1119. Here, the credited testimony establishes that junior foreman Mike Wichter told the reprocessing employees that company owner Steven Ross was going to pay them for the November 6 shift, "but now that they were with the union he had decided not to pay them."

Poly-America argues this issue was not fully litigated, as it did not understand that the NLRB was charging a separate unfair labor practice violation on the basis of Wichter's testimony. We agree. The complaint alleges that Wichter "discouraged employees from supporting the union" by telling them the union had threatened to burn down the plant, by charging them $300 in dues, by denying employees overtime opportunities, by paying employees only minimum wage, and by offering inferior health insurance. There is no mention made of Wichter's statement that the company would not be paying the employees for the November 6 shift, and we disagree with the NLRB that this issue is closely related to the violations charged. *See Engineers & Fabricators, Inc. v. NLRB*, 376 F.2d 482, 485-86 (5th Cir. 1967) (holding that an issue was not fairly litigated where the allegation was not listed in the complaint and counsel did not understand the relevance of testimony later used to support the uncharged violation).

Nor do we find a section 8(a)(1) violation on the basis of the statements of company trainer Arnie Ramos. The ALJ found that the company committed an unfair labor practice through Ramos' November 15 statement to employees that they had been fired because of their union involvement. There is not substantial evidence to support this determination. The testimony of numerous witnesses and counsel's stipulation at the hearing confirms that Ramos used the word "replaced" rather than "fired," and informing workers that they have been replaced during the pendency of an economic strike is not a violation of the Act. *See International Van Lines*, 409 U.S. at 50, 93 S.Ct. at 76. While we agree with the NLRB that Poly-America had in fact discharged the strikers on the night of the 14th, before any replacements were hired, we disagree that the company committed an additional

-25-

violation by subsequently informing the strikers that they had been replaced.[5]  Consequently, we do

not enforce the Board's order with regard to the separate section 8(a)(1) violation by Arnie Ramos.

**E**

A company violates section 8(a)(1) when it conditions reinstatement of striking employees

on a response to the offer of reinstatement within an unreasonably short time.  *See NLRB v. Murray*

*Products, Inc.*, 584 F.2d 934, 940 (9th Cir. 1978); *Esterline Electronics Corp.*, 290 NLRB 834, 835

(1988), *enforced mem.*, 770 F.2d 1073 (3d Cir. 1985).  Here, the Board found a section 8(a)(1)

violation in company owner Steven Ross' letter to the nineteen striking employees, offering

reinstatement if the employees reported within a short period of time—for some employees on the

same day, for others the next day, and for still others several days later.

Viewed in isolation, these dates do appear to be unreasonable.  *See Murray Products*, 584

F.2d at 940 (noting that the Board has often held such short response times invalid under the Act).

We agree with the Tenth Circuit, however, that the Act requires us to look at factors other than the

set deadline alone in making a determination of reasonableness.  *See NLRB v. Betts Baking Co.*, 428

F.2d 156, 158 (10th Cir. 1970).  Where, as here, the employees receiving the reinstatement did not

express any concern over the short deadline—indeed, sixteen of the nineteen employees accepted

reinstatement and returned to work on dates established by mutual consent—we cannot then hold that

the deadline was unreasonable.  *See id.*  Of the three remaining employees, one declined the offer

because of new employment, one never responded, and one accepted the offer but never reported for

---

[5]        There is evidence in the record that Ramos joined the security guards on the night of the 14th and explained to the employees that the reason they were not permitted back into the plant was because they had been fired.  The ALJ specifically linked Ramos' section 8(a)(1) violation to the statements made on the 15th alone, as part of the translation for Bertrand.

work. None of these three employees testified before the ALJ, and there is no evidence in the record that these employees' decisions were in any way affected by the deadlines set in the letters. In this light, we do not find substantial evidence to support the Board's determination that the reinstatement letters required a response in an unreasonably short amount of time, and do not enforce this aspect of the Board's order.

## IV

Poly-America next challenges the Board's determination that employee Jason Snow was unlawfully discharged because of his union activity—distributing union pamphlets and leaflets, attending union meetings, and discussing the union with co-workers. Section 8(a)(3) of the Act prohibits discrimination "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Thus, "[i]t is elementary that an employer violates section 8(a)(3) and (1) of the Act by discharging employees because of their union activity." *Adco Elec.*, 6 F.3d at 1116, *citing NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 397-98, 103 S.Ct. 2469, 2472-73, 76 L.Ed.2d 667 (1983). The Board bears the burden of proving through direct or circumstantial evidence that anti-union animus was a "motivating factor" in the decision to discharge the employee. *Id*. The evidence must support a "reasonable inference of causal connection between the employer's anti-union motivation and the employee's discharge." *NLRB v. O.A. Fuller Super Markets, Inc.*, 374 F.2d 197, 200 (5th Cir. 1967). If the Board meets this burden, it establishes a prima facie case of discriminatory discharge, and the company must come forward with evidence showing that the employee would have been discharged even absent the protected activity. *See Transportation Mgmt. Corp.*, 462 U.S. at 401, 103 S.Ct. at 2474; *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1408 (5th Cir. 1996).

-27-

The Board determined that Poly-America discharged Snow because of his union activities, notwithstanding the company's explanation that Snow was lawfully discharged at the end of a probationary period for poor performance. The Board held that the company knew of Snow's union organizing activities because Snow was open about his union involvement, and because Snow was frequently questioned about his union activities by his immediate supervisors. The Board further held that Poly-America's proffered explanations for Snow's discharge were shifting and properly discredited as pretextual. On appeal, Poly-America reasserts that Snow was discharged at the conclusion of his probationary period for poor performance, and that there is no evidence in the record to support the finding that the company's reasons for his discharge were pretextual. Accordingly, we must decide whether the record contains substantial evidence that Snow's discharge was motivated by Poly-America's anti-union animus, and if so, whether substantial evidence supports the finding that Poly-America failed to meet its burden of proving Snow would have been discharged in the absence of his union activities.

Whether the NLRB met its burden of proving that Snow's discharge was improperly motivated is initially contingent on whether it can demonstrate that the company had knowledge of Snow's union activities. More specifically, "to prove a violation of these sections of the Act, the Board must show that the particular supervisor responsible for the firing knew about the discharged employee's union activities." *Delchamps, Inc. v. NLRB*, 585 F.2d 91, 94-95 (5th Cir. 1978). We must therefore review the record for substantial evidence that the supervisor responsible for Snow's discharge, James Qualls, had knowledge of Snow's union involvement—notwithstanding Qualls' unequivocal testimony that he had no such knowledge. The first evidence relied upon by the Board is the fact that Snow openly distributed union flyers, attended union meetings, and discussed union

matters with other employees. Although uncontradicted, Snow's openness in his union involvement cannot, standing alone, constitute substantial evidence that Qualls was aware of the activity. There is no evidence in the record that Qualls was ever present at a union meeting, or that Qualls ever saw Snow distributing literature or engaging in conversations. Without such linkage, the evidence that Snow was open in his union participation is not by itself adequate circumstantial evidence from which Qualls' knowledge may be inferred. *Cf. WXGI, Inc. v. NLRB*, 243 F.3d 833, 841 (4th Cir. 2001) (considering the openness of employee union involvement as one factor in imputing knowledge to the radio station president when "activity occurred openly enough and to such an extent that reports of it came to his attention despite his absence from the station."); *FPC Holdings Inc. v. NLRB*, 64 F.3d 935 (4th Cir. 1995) (holding that company's knowledge of employee's union involvement was properly inferred from the fact that the employees discussed a planned union meeting openly in the company's warehouse and over the company's CB radio at a time when the company was closely monitoring one of the employee's behavior).

The other evidence relied upon by the Board is the testimony of Snow that he was frequently questioned by his direct supervisors, leadmen Andy Farmer, Trinidad Rivera, and Lee Marsh, about his union activity; from this questioning, the Board imputed knowledge to their immediate supervisor, Qualls. While it is permissible to "'rel[y] on circumstantial evidence to infer that the knowledge of one supervisor has been communicated' to the other," *Pioneer Natural Gas Co. v. NLRB*, 662 F.2d 408, 412 (5th Cir. Unit A 1981), *quoting Delchamps*, 585 F.2d at 95, the Board is not permitted to "mechanically impute" the knowledge of a lower-level supervisor to the decision-making supervisor. *Id.*

We agree with the Board, however, that there is adequate circumstantial evidence in the

-29-

record to support the conclusion that the leadmen communicated their knowledge to Qualls. When asked whether he had ever discussed the union with Qualls, leadman Farmer responded that he had identified the union as a problem in as far as it affected work productivity. Snow testified specifically that he was questioned by the leadmen regarding his union involvement, and leadman Rivera testified to his own awareness of Snow's activities. Both leadmen who testified described their responsibility of making personnel reports to Qualls, including reports on the progress of Snow during his three month probationary period. In this light, there is ample evidence on the record to support the inference that the leadmen communicated their knowledge of Snow's union activity to Qualls.

Poly-America relies on two cases, *Delchamps* and *Pioneer Natural Gas*, for its contention that imputing knowledge to Qualls is improper. In *Delchamps*, however, the NLRB attempted to impute knowledge from the supervisors at a satellite grocery store to an area supervisor who ordered the suspension of an employee based on a customer compliant. Because the area supervisor ordered the suspension before he was even aware of the employee's identity, we concluded that it was impossible that the suspension was in retaliation for the employee's union involvement. *See Delchamps*, 585 F.2d at 94. In *Pioneer Natural Gas*, we also rejected the imputation of knowledge from one supervisor to the next where neither the ALJ nor the Board made findings that the decision-making supervisors had knowledge of the union activity, nor that this knowledge had been communicated by the lower-level supervisors. *See Pinoeer Natural Gas*, 662 F.2d at 412. Here, by contrast, both the ALJ and the Board found that Qualls had knowledge of Snow's union activity, based upon the information flow from the leadmen to Qualls. Just as we "may not lightly displace the Board's factual finding of discriminatory intent," neither do we displace the finding of knowledge of union activity. *Brookwood Furniture*, 701 F.2d at 463. The evidence in the record of the

communication between Snow, the leadmen, and Qualls, coupled evidence that they had an intimate daily working relationship, supports the Board's imputation of knowledge of Snow's union activity to Qualls.

It is a closer question whether there is also substantial evidence in the record to support the finding that this knowledge was a motivating factor in the decision to discharge Snow. The evidence in the record demonstrates that Snow was discharged concurrent with the November union activity at the Poly-America plant—but also concurrent with the end of his three month probationary period. Qualls and the leadmen cite Snow's disrespect for company safety policies, absenteeism, failure to procure needed tools and shoes, laziness, stated dislike for his job, and insubordination as the factors that motivated his termination. There is direct evidence in the record that Snow in fact violated company policy by wearing his safety goggles on top of his head, received a written warning regarding his absenteeism, and cursed out leadman Farmer. The evidence that anti-union animus motivated the discharge, by contrast, is circumstantial. The Board relies on Poly-America's shifting explanations of its reasons for Snow's discharge, the absence of warnings given to Snow, and the absence of documentation of Snow's infractions. In addition, the ALJ credited the testimony of Snow that when he inquired as to why he was being discharged, Farmer answered the "way he was going to answer everybody else the rest of the day, which is, he would take the Fifth." Farmer continued, "I just basically want to tell you one thing; I think you got a raw deal."

We will assume *arguendo* that this evidence is sufficient to establish that anti-union sentiment was a motivating factor in Snow's discharge. *See NLRB v. Mini-Togs*, 980 F.2d 1027, 1032-33 (5th Cir. 1993) ("[m]otive is a factual matter...and the Board may reasonably infer motive from the circumstances surrounding the employer's actions"). We disagree, however, with the Board's

conclusion that Poly-America failed to meet its burden of proving that it would have discharged Snow in the absence of his union activity. Under the analysis in *Transportation Mgmt. Corp.*, 462 U.S. at 393, 103 S.Ct. at 2470, a company may discharge an employee even where union activity is a motivating factor in that discharge if the company can prove that the termination decision would have been the same regardless of the protected conduct. *See Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), *enf'd* 662 F.2d 899 (1st Cir. 1981); *see also Thermon Heat Tracing*, 143 F.3d at 186-87. The uncontradicted evidence in the record is that Snow did not follow safety regulations with respect to his goggles, insulted one of his supervisors, and voiced his dislike for his job with frequency. The fact that the company did not present a documented history of Snow's job performance is due to the informal, evaluative nature of the probationary period, and cannot alone underlie an inference that Snow's shortcomings—testified to by three witnesses—were dreamed up in anticipation of litigation. *See NLRB v. Ryder/P.I.E. Nationwide*, 810 F.2d 502, 509 n.4 (5th Cir. 1987) ("It thus cannot be said that the absence of disciplinary action creates an unblemished record just as it cannot be said that an absence of criminal convictions makes a person a model citizen."). There is no evidence on the record that Poly-America's handling of Snow's probationary period differed in any way from its handling of the probationary period of other employees. *Cf. New Orleans Cold Storage & Warehouse Co., Ltd. v. NLRB*, 201 F.3d 592, 601 (5th Cir. 2001) (rejecting a company's argument that the employee would have been terminated regardless of his union activity where the evidence was that the company did not ordinarily enforce certain rules and procedures).

The credited testimony establishes only that Snow occasionally received praise for his work, had difficulty obtaining his work shoes due to his large shoe size, was accommodated in some of his

court-related absences, and was not informed early in his employment of the required tools. None of this credited testimony undercuts the evidence presented by the Board that indicates that Snow's progress was evaluated throughout his probationary period, and that he ultimately proved to be an unenthusiastic and possibly unreliable employee. Accordingly, we hold that the record lacks substantial evidence that Poly-America failed to meet its burden of proving that it would have discharged Snow in the absence of his union activity.

V

Poly-America challenges the Board's determination that employees Britt Samson and Brian Robinson were unlawfully suspended for their union activity—distributing union literature and authorization cards in the employee parking lot an hour before the start of their morning shift. As noted above, section 8(a)(1) requires employers to permit employees to engage in union solicitation outside their working hours, even if the solicitation occurs on company property. *See Cooper Tire*, 957 F.2d at 1249. Section 8(a)(3) prohibits disciplining employees as a reprisal for engaging in such protected union activities. *NLRB v. Delta Gas, Inc.*, 840 F.2d 309, 311 (5th Cir. 1988).

Both parties agree to the basic historical facts that Samson and Robinson arrived an hour early for their November 14 shift, for the purpose of distributing union literature and authorization cards. As Samson and Robinson began to pass out the materials in the employee parking lot, they were approached by the company security guards and instructed to leave the property or move to an easement adjoining the parking lot. Samson and Robinson refused, and, despite the security guards' repeated instructions to leave, continued to distribute the materials until the beginning of their shift. Shortly after the beginning of the shift, Samson and Robinson were asked to report to their supervisor, Charles Allgood. Allgood asked Samson if he had been asked by a security guard to leave

the property; Samson responded that the security guards had so instructed him, but that he had not left. Allgood then imposed a three day suspension on both Samson and Robinson.

As with the discharge of Jason Snow, Poly-America asserts a legitimate business reason—insubordination—for its suspension of Samson and Robinson. The Board therefore bears the burden of proving an anti-union motivation. *See Cooper Tire*, 957 F.2d at 1253. Again as with Jason Snow, the primary dispute is over whether the supervisor responsible for the suspension, Charles Allgood, had knowledge of Samson and Robinson's union activity at the time he suspended them. We find substantial evidence on the record to support the Board's finding that he did, and that the suspension was unlawfully motivated by the company's anti-union posture.

The credited testimony establishes that the security guards were aware of Samson and Robinson's union activity at the time of the parking lot confrontation, and that Allgood summoned Samson and Robinson to see him shortly after the beginning of their shift. It is therefore clear that the Board could reasonably infer that at some point between the confrontation and the suspension, the security guards must have discussed the parking lot incident with Allgood—otherwise it is unexplained how Allgood knew that Samson and Robinson had been insubordinate. Poly-America asks us to believe that every aspect of the confrontation and insubordination was included in this discussion except Samson and Robinson's union activity. The record, however, contains substantial evidence to the contrary. Not only were the security guards aware that Samson and Robinson were engaged in protected activity at the time of the confrontation, but also, and as discussed above, the company was simultaneously videotaping the events in the parking lot. Additionally, when Allgood informed Samson and Robinson that they were suspended, Samson asked Allgood if he realized that the security guards had acted illegally in asking them to leave. Poly-America is correct that there is

no direct evidence on the record that the security guards told Allgood about the union activity, that Allgood viewed the videotape, or that Allgood understood the reference in Samson's question. But circumstantial evidence is adequate to prove the anti-union aspect of the suspension. *See Transportation Mgmt. Corp.*, 462 U.S. at 397, 103 S.Ct. at 2472.

Here, the ALJ made reasonable inferences that Allgood understood from Samson's question that union activity was involved, that Allgood was informed of the union activity as well as the insubordination in his discussion with the security guards, and that Allgood had an opportunity to view the videotape that Poly-America admittedly obtained. We uphold these reasonable inferences as substantial evidence that Allgood knew Samson and Robinson were engaged in protected activity in the parking lot, and that they were discharged as a consequence of this activity. *See O.A. Fuller Super Markets, Inc.*, 374 F.2d at 200. Poly-America has come forth with no evidence that Samson and Robinson would have been disciplined for insubordination even in the absence of their union activity. We therefore enforce the Board's order with respect to the unlawful suspensions of Britt Samson and Brian Robinson.

## VI

For the foregoing reasons, we reverse the Board's determinations concerning (1) the termination of Jason Snow; (2) Mike Wichter's statement to employees concerning the company's decision to rescind payment for the November 6 shift; (3) Arnie Ramos' statement to the striking employees that they had been permanently replaced; and (4) the letter offering reinstatement within a specified period of time. We uphold all other aspects of the Board's decision.

IT IS SO ORDERED.